FREDERICK E. CONRAD, Respondent, v. NINA C. BOOGHER, et al., Appellants.

St. Louis Court of Appeals. Opinion Filed May 6, 1919.

1. **COVENANTS: Easements: Building Restrictions: Construction.** In restrictive covenants, if any reasonable and substantial doubt appears as to the meaning thereof, such doubt must be resolved against the original grantor and in favor of the free and untrammeled use of the property.

2. ———: ———: ———: Porch: Closed Porch: Porte-Cochere. A covenant in a deed restricting the grantee from erecting any building or erection or construction of any character, except a division fence or *porte-cochere* or porch, within five feet from the side lines of said lots, *held* not to prohibit the erection of a building structure within five feet, the lower part of which has a brick wall opposite the main house wall with four small windows and the ends consisting of large openings provided with doors extending from the main house wall, etc., and the upper portion on three sides consists mainly of windows, so that the porch or room may be thrown open in summer or closed in winter.

3. ———: ———: ———: ———: ———: ———. And *held* that the upper portion of such structure was a porch within the meaning of such restrictive covenants, and whether or not the term *porte-cochere*, as used in such restrictive covenants, was broad enough to include the lower portion of such structure (a covered driveway provided with doors so that it may be entirely closed), being a matter by no means free from reasonable or substantial doubt, it follows that the doubt must be resolved in favor of defendants.

4. ———: ———: ———: ———: ———: ———: Garage. And, *held* that the fact that defendant's automobile was allowed to stand in the so called *porte-cochere* while not in use, was not sufficient to warrant the holding, under the evidence adduced, that the structure is in effect, a garage, and not a *porte-cochere*.
   REYNOLDS, P. J., dissents, being of opinion that the erection was not a *porte-cochere*, but a garage, and so used, and its erection contrary to the restrictions of the deed.

5. **APPELLATE PRACTICE: Equity Case: Rule of Review: Trial De Novo.** The rule in equity cases requires a full presentation of the evidence to the appellate court for the reason that in such cases the trial in the appellate court is to the effect of a trial *de novo*, and whilst the finding of the lower court is looked upon as persuasive, it is not binding.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. George H. Shields,* Judge.

REVERSED AND REMANDED (*with directions*).

*Percy Werner* for appellants.

*Boogher & White* of Counsel.

(I) This being an equitable suit, this court will, under the. well-established procedure in equity, try the

case *de novo*.   (2) · The court erred in admitting testimony as to the use to which one of the defendants, a physician, put the *porte-cochere*.   If the building, as it stands, constitutes a violation of the covenant, or, on the other hand, does not constitute such a violation, it continues to be such regardless of its occupancy.   It is such even though it be unoccupied; though it be occupied by a lawyer, or a merchant.   And it is immaterial whether the lawyer or the merchant uses the structure for storing an automobile.   It certainly needs no citation of authorities in support of this proposition.   The . court below gave more or less weight to this evidence—to the fact that when Dr. Boogher's automobile was not in use, it was kept in the lower part of the structure objected to, and the error of the trial court was a prejudicial one.   (3) Such restrictions as are involved here are to be construed strictly in favor of the free use of property, unless the context of the instrument discloses an intention to the contrary.   Kitchen v. Hawley, 150 Mo. App. 497, 505;  Thompson v. Langan, 154 S. W. 513;  172 Mo. App. 82-3;  Sanders v. Dixon, 114 Mo. App. 229, 252-3.   All doubts are to be resolved against the restrictions and in favor of the free and unrestricted use of the property.   Johnson v. Jones, 244 Pa. 386. "Whether they would tend to beautify the general neighborhood depends entirely upon taste, and that is not a question for discussion."   Id.   The burden is on plaintiff to show conclusively that the covenant has in fact been broken.   Kitchen v. Hawley, 150 Mo. App. 497, 505;  Kenwood Land Co. v. Hancock Inv. Co., 169 Mo. App. 715, 722, 724;  Forsee v. Jackson, 192 Mo. App. 408, 182 S. W. 783, 785, col. 1;  Reed v. Hazard, 174 S. W. 111. 187 Mo. App. 547.   (4) The decree is inequitable —it bears against the defendants out of all proportion to the benefits to plaintiff.   It destroys the home of the one to gratify the caprice of the other.   Kenwood Land Co. v. Hancock Inv. Co., 169 Mo. App. 715, 720, 724; Schopp v. Schopp, 162 Mo. App. 558, 654-5.  (a) If plaintiff is entitled to any decree then on the record it

should go no further than to require the elimination of the hanging doors of the *porte-cochere*. Bailey v. Culver, 84 Mo. 531, 539-40; Thompson v. Langan, 172 Mo. App. 88. (b) If the court grants equitable relief, the decree should be as moderate as is consistent with effectually correcting the mischief. St. Louis Dep. Bank of Kennett, 101 Mo. App. 395; Forsee v. Jackson, 192 Mo. App. 408, 182 S. W. 783. (5) Plaintiff was guilty of laches. After learning the intention of defendants with respect to the structure to be erected, in an amicable interview with them, he acquiesced and waited until the building was nearly completed without further objection until filing suit. St. Louis Deposit Bank v. Kennett, 101 Mo. App. 370, 397. Troll v. St. Louis, 257 Mo. 626, 659, 660-62. The evidence also points strongly to the plaintiff's acquiescence in the course pursued by defendants. See the Kennett case, next above, 101 Mo. App. 398-400.

*Harry H. Haeussler,* for respondent.

(1) In equity cases the appellate court has jurisdiction to review the facts as well as the law, but the hearing on appeal is not a trial *de novo*. The appellate court will consider the evidence from the standpoint most favorable to the successful party below, especially where the evidence is presented in narrative form. Walker v. Dobbins et al., 152 Mo. App. 270; Insurance Co. v. McDearmon, 133 Mo. App. 671; Bank v. Russell, 181 Mo. App. 698; Sanders v. Dixon, 114 Mo. App. 229 (cited by appellants). (2) The conditions and restrictions contained in the trust agreement should be interpreted in the light of the facts existing when the restrictions were imposed and the words used should be given their generally accepted meaning at the time of the execution of the trust agreement. Sanders v. Dixon, 114 Mo. App. 229. (3) It is not necessary in order to maintain an action to restrain the violation of building restrictions by a property owner, that he be notified, prior to the completion of the structure, that its erec-

tion will constitute a violation of the restrictions where the deed conveying the property notified him of the existence and character of such restrictions. Compton Hill Imp. Co. v. Strauch, 162 Mo. App. 76. . (4) Covenants in the nature of restriction on the use of the fee are valid, when reasonable and within the policy of the law, and equity will enforce them. The restrictions must be observed whether their nonobservance will inflict injury or not and a grantee in a deed containing such restrictions cannot substitute others for what has been agreed upon. St. Louis Save Dept. Co. v. Kennet Est., 101 Mo. App. 370; Forsee v. Jackson, 192 Mo. App. 408; Kenwood Land Co. v. Hancock Inv. Co., 169 Mo. App. 714; Compton Hill Imp. Co. v. Strauch, 162 Mo. App. 76.

ALLEN, J.—This is a suit in equity whereby it is sought to restrain the defendants from maintaining a certain structure alleged to consist of a garage with a room above the same, upon a lot of ground belonging to the defendant Nina C. Boogher, wife of her codefendant Dr. Frank Boogher; it being alleged that said structure is located within five feet of the line of plaintiff's adjoining lot in violation of certain building restrictions. The trial court entered a decree in favor of plaintiff, ordering defendants to remove the structure and perpetually enjoining and restraining them from constructing or maintaining a similar structure within five feet of the division line of plaintiff's lot. From this judgment defendants have appealed to this court.

The lot belonging to defendant Nina C. Boogher is situated in the city of St. Louis, near the western limit thereof, and is designated as lot No. 1 of block 7 of "Parkview," a subdivision lying partly in the city of St. Louis and partly in St. Louis County. It fronts on the south line of Berlin avenue, a curved street, and is bounded on the east by Skinker road. The lot immediately west thereof is owned by the plaintiff who has a dwelling house thereupon. Defendant Nina C.

Boogher acquired her lot in June, 1914, and shortly thereafter defendants erected a dwelling house upon the same. The record shows that the Beredith Realty Company, a corporation, from which plaintiff and defendant Nina C. Boogher derive title to their respective lots, subdivided this Parkview tract, platted the property by plat duly filed of record, and executed to certain persons a trust agreement, likewise duly recorded, whereby certain building restrictions were imposed upon each of the lots in the subdivision for the benefit of the owners of all of the other lots therein. Defendant Nina C. Boogher acquired her lot subject to these restrictions, among which are the following:

"And neither said Realty Company, its successors or assigns, owner or owners of any of said lots, in said subdivision shall or will at any time . . . *erect any building or erection or construction of any character, except a division fence or porte-cochere or porch within five (5) feet from the side lines of said lots,* without the written consent of the owners of the lot adjoining on the side." (Italics ours).

At the time of the erection of their dwelling house upon the lot of Nina C. Boogher, the defendants erected upon the western side of the lot and adjoining the main portion of their residence building the structure here in question, the west wall thereof being within less than five feet of the east line of plaintiff's lot. The testimony touching the matter, together with photographs in evidence, shows that this alleged objectionable structure is of brick construction, the west wall of the main building being utitlized as one wall thereof. The lower part thereof, alleged by plaintiff to be a garage, has a brick wall at the west with four small windows therein; the north and south ends consisting of large openings extending practically, if not entirely, from the main house wall to the western wall of the structure. A granitoid driveway extends from Berlin avenue through these openings, and, according to the testimony, continues a distance of twenty-five or thirty feet beyond the south

opening into the rear yard of the premises. These openings are provided with large "hanging" doors, which, it is said, are detachable and removable, the upper part thereof being mainly of glass. When these doors are swung back and fastened on the inside, or removed, the lower part of the structure has the appearance of a covered driveway. And a door leads from the main building into this driveway, or so-called porte-cochere. The evidence shows that Dr. Boogher, who is a physician and is frequently called out at night, customarily leaves his automobile standing in this place at night and likewise during the day when it is not in use. And the evidence further shows that the defendants have no other place upon the premises for housing their automobile, or, as stated by appellant's learned counsel, defendants "have no other garage." And the testimony shows that in inclement weather the doors at the north and the south openings are closed. The testimony is to the effect, however, that the defendants "have none of the ordinary appurtenances of a garage" in this place; that while they have a water faucet therein, for use in washing the driveway, sprinkling lawns, etc., as they have at the east side of the house, there is no floor drain therein. Dr. Boogher, called as plaintiff's witness, testified that the machine is not washed or cleaned at this place, that all of the repair work thereupon is done elsewhere, and that no automobile supplies or appliances are kept there. And he said: "The porte-cochere is open front and back so that you can drive right through and the doors are detachable and removable. Before this inclement weather it was altogether open."

The upper portion of this structure defendants term a sleeping porch. It has a roof—that may be termed a flat roof—with a ceiling of wood. The three exterior sides, i. e., the north, west and south sides, consist mainly of windows so that the porch or room may be thrown almost entirely open in summer, or closed in cold or inclement weather. A door leads from the

second story of the dwelling house to this porch or room, and there is a hot water radiator therein. It was shown that the interior walls are unplastered, and that the glass windows are upon frames to that they can be readily removed.

One Roth, a brother-in-law of plaintiff, testified that the doors on the *porte-cochere* or garage had been on ever since defendants began living in the house, and that these are "always closed except for ingress and egress;" and that "the windows on the porch are as a rule down." On cross-examination, however, he said that when he stated that the doors were closed and the windows down he "meant the whole time it was being built up to last June, (1915);" that he knew nothing "about its use" after that time.

Plaintiff called but one expert witness, one Max Wolf, an architect. A portion of his testimony, as it appears in narrative form in the record before us, is as follows: "I would say that a *porte-cochere* is a garage (carriage) entrance, an entrance for garages (carriages) to a residence as a rule. My understanding of the word '*porte-cochere*' always was that a *porte-cochere* is an open structure, supported by or upon doors or columns, whatever it may be, even wooden posts or stone columns, or iron, or whatever it happens to be, depends upon the nature of the building or expense that people want to put into the building. It does not have doors or windows that I know of. I don't know of any *porte-cocheres* that were constructed with doors and windows. There may be some, however." He was asked: "Suppose it were being used for the storage of an automobile?" And he answered (after objection of defendants had been overruled) "I would call it a garage."

In regard to the so-called sleeping porch this witness said: "It is pretty hard to define a porch. There are different kinds of porches, open porches and closed porches. It depends entirely upon how the owner wants it built and where it is situated with reference to the

house.   An enclosed porch could be built with solid
walls and permanent sashes for the windows.''   After
being shown a photograph of defendants' dwelling
house with this structure adjoining the same, he said:
''Well, it takes quite a stretch of the imagination to
call that a *porte-cochere*.   I wouldn't call it a *porte-
cochere*.   The second floor of same would be an en-
closed porch.   The upper portion of that I would term
a closed porch.''   And he stated that it is quite cus-
tomary to put porches on top of *porte-cocheres*.   After
testifying further as to the character of the lower part
of the structure he said: ''I understand that the north
side and the south side are wholly open, except so far
as they may from time to time be closed by hanging
doors.   When these doors are removed and stored
away down in the cellar of the main house, and the
driveway extends right through and one can come in
from the front of the house, from Berlin avenue and
drive in and let the passengers alight and step into the
house underneath this structure and then the vehicle
passes on through the south side and out on Skinker ave-
nue (there being no exit on Skinker avenue) then that
would be in the nature of a *porte-cochere*, and the fact
it was enclosed on the west side would not make it any
less a *porte-cochere*.   What changes it from a *porte-
cochere*, it looks to me like the permanency of the doors
establishes the fact that the idea of having just a
*porte-cochere* is entirely omitted there.   The doors de-
termine that.   If you voluntarily, or under the court's
order, remove these doors once for all, then it would
approach a *porte-cochere*, would meet my definition of a
*porte-cochere*.''

One Lawrence Ewald, an architect, called as an
expert witness by defendants, testified that he was
familiar with the structure at the west side of Dr.
Boogher's residence, and that the lower portion thereof
is a *porte-cochere*, according to his understanding of
the term as an architect.   He said: ''A carriage porch
has an open carriage entrance to the house and the

*porte-cochere* has, as the name implies, a carriage door or coach door." After stating that the word "garage" is difficult to define, he said: "The fact that there are doors hanging at the entrance and exit of this so-called *porte-cochere* does not change it in my mind from being a *port-cochere.* A carriage entrance I should say has a right to have doors. They have in the usual sense of a *porte-cochere,* I don't see why they shouldn't have doors in St. Louis as well as in other cities and in Europe. *Porte-cocheres* are always provided with doors. A *porte-cochere* practicially always has doors front and rear, a carriage porch has not. I have observed the *porte-cocheres* in Paris. The custom of hanging doors on the front and rear, as shown in defendants' photograph Exhibits 2 and 3, is very common in New York, Philadelphia and even in Detroit and San Francisco. It is a common thing in most of the large cities of the United States to build a carriage entrance with doors to keep out the weather, to protect the vehicle. Many houses in New York, San Francisco, Philadelphia and Detroit have *porte-cocheres* provided with doors. There are many of them right out here in Parkview subdivision. . . . The structure having a *porte-cochere* is a sleeping porch, properly so called according to my understanding. The term, of course, is a new one, probably ten years old. It started out with a little place over the kitchen porch and it has grown up to the present time to a room with hardwood floors, and you cannot tell them in any other way from any room in the house, except that they have more window space. This has a brick wall and beamed ceiling and water-proof floor. This has a radiator, but I think every sleeping porch is entitled to a radiator. It is built on top of the *porte-cochere.* The top of the *porte-cochere* is utilized as a porch."

On cross-examination this witness said: "I should say that the thing commonly used in this country is not a *porte-cochere;* it is simply a carriage porch; that is

the thing as it was used ten or fifteen years ago. Ten or fifteen years ago the term *'porte-cochere'* was used in the same manner as I am now using carriage porch. Ten or fifteen years ago, when an owner requested a *porte-cochere,* it would have been built practically open on all sides, with just protection above from the weather. At least that is partially true. But take Mr. Price's house and Mr. Green's house which are practically the same as this house, it is called a *porte-cochere.* The term porch during the last ten or fifteen years has grown to mean a great deal more than what it is commonly known as. If a man spends more money on a porch to-day than he did ten years ago, it does not change the fact of a porch. I think I should have called that room above the porch a *porte-cochere* ten years ago, and had I been asked about this lower portion of this building ten years ago, I should have unhesitatingly called it a *porte-cochere.''*

One H. C. Toensfeldt, called as an expert witness for defendants, testified that he had examined the structure in question and that the lower portion thereof had all of the characteristics of a *porte-cochere,* describing it. As to what constitutes a garage, he said: ''A garage, I should say, is for an automobile what a stable is for a vehicle, and it is the universal practice for a garage to have its equipment for an automobile just as a stable would have its equipment for a horse and vehicle. This one has none of the equipments that are usual in a garage. . . . The fact that there are doors hung at the entrance and exit over this drive in no way changes its character as a *porte-cochere.''* The upper portion of the structure, which he described, he termed a sleeping porch.

On cross-examination he said that if he would have been asked ten years previously for a description of a *porte-cochere,* it would have included ''such a *porte-cochere* as is on Dr. Boogher's residence.'' He said that ''ten years ago'' a *porte-cochere* ''could properly have been designated as a closed space for a vehicle to stand while receiving and discharging its passengers.''

He stated that the distinction made by the witness Ewald between a carriage porch and a *porte-cochere* "is the commonly accepted distinction." He further said: "If an automobile were placed in this building . . . at night and while not in use during the day, I should still call it a *porte-cochere,* although I can see that some people would call it a garage." On further cross-examination he said: "A *porte-cochere* on the outside of a house, which has a place for ingress and egress for vehicles, so as to prevent occupants from coming in contact with the weather, has not been usually enclosed until recently in St. Louis."

On redirect examination he said: "I suppose in St. Petersburg you might have a *porte-cochere* enclosed at all seasons of the year, and down in Buenos Ayres you might have it open all the year; I don't know. The essential feature that remains the same all the time is that you have a driveway for a vehicle, so that you can step from the vehicle to the house with the aid of a step or two. That is the primary function, that is what runs all the way through from the time when they first commenced to construct *porte-cocheres,* and the others are all nonessentials. And sleeping porches have been used for perhaps a thousand years. The principal feature of a *porte-cochere* is that it is detached from the main building and rests on supports on the four corners and the balance of it, as to whether it has windows and how many bricks are on one side or the other and what is the nature of the roof above it, these are all details arranged by the particular owner of the building. It is outside of the main walls of the building. I should say the characteristics of a porch was that it was outside of the building, exposed side, and one that could be very readily ventilated and exposed to the wind, and this particular structure in question does have that characteristic; a large portion of the wall area is windows which can be opened."

Defendants also called one Wiedemeyer, the architect who designed Dr. Boogher's residence with this adjoining structure. He said: "My description of a

*porte-cochere* would be a covered driveway and entrance that will lead into a house; that is a *porte-cochere*. The placing of doors on the front and rear of the driveway is a matter of choice for the owner. If he wants to keep out the inclement weather, he will put the doors in. Some *porte-cocheres* are enclosed on all sides. . . . It might be enclosed or it might be open. I don't think there is any difference between the acceptation ten years ago and that to-day. If I remember right, I designated it as a *porte-cochere* on the plans, and in my acceptance of the term 'porch,' that would cover a structure as at present surmounts this *porte-cochere*."

Though the only expert witness called by plaintiff termed the upper portion of the structure in question a "closed porch," learned counsel for plaintiff, respondent here, insists that it is not a porch within the meaning of that term as used in the restrictions. In this connection it is urged that these restrictive convenants should be interpreted as they were understood at the time when they were imposed by the trust agreement mentioned. As to this we may say that we have found nothing in the evidence adduced showing when this trust agreement was executed and recorded. The petition alleges that it was dated November 25, 1905. By consent a printed copy thereof was introduced in evidence, and counsel read therefrom, but only a part of the exhibit appears in the record. However, in view of the manner in which the case was tried, we are perhaps warranted in assuming that it was understood throughout that the restrictions were imposed about ten years prior to the trial below which occurred January 11, 1916. As to the "sleeping porch" this matter does not appear to be of importance. Though it be that within the last ten or fifteen years there has been an increasing tendency toward a more substantial or elaborate construction as applied to structures of this character, the evidence makes it appear that sleeping porches, having the essential characteristics of that

here in question, i. e. of exterior construction and designed to afford a place for open-air sleeping, with a certain amount of protection from the elements, were well known and quite common at and prior to the time when these restrictions were imposed.

As shown above, plaintiff's expert witness termed the upper portion of the structure in question a "closed porch." And all of defendants' expert evidence shows that it is a species of porch as that term is used locally and as it was used ten years or more prior to the trial. Respondent's learned counsel quotes certain definitions of the term porch as given by the lexicographers. These we need not set out. . The word is used in a variety of senses, differing somewhat in different localities in this country. The evidence shows that, as used in this locality at least, the term is, and for many years has been broad enough to include a sleeping porch such as that here involved. And a general dictionary definition of the word ought not to be allowed to prevail over overwhelming testimony of this character in the record.

Furthermore, as to both the word "porch" and the term *"porte-cochere,"* as used in these restrictive covenants, it must be borne in mind that if any reasonable and substantial doubt appears as to the meaning thereof, as thus used, such doubt must be resolved against the original grantor and in favor of the free and untrammeled use of the property by its present owner. In the recent case of Bolin v. Tyrol Inv. Co., 273 Mo. 257, 200 S. W. 1059, which went from this court to the Supreme Court on certification, it is said:

"Covenants of this character, expressed in deeds of conveyance of lands are in the nature of easements reserved by the grantor in the lands conveyed, appurtenant to his other lands. [Improvement Co. v. Tower's Exr., 158 Mo. 282; King v. Trust Co., 226 Mo. 351. In these cases we called it 'an easement running with the land.' It is, as such, an incumbrance

consistent with the passing of the fee by the conveyance in which it is reserved. . . . It is useless to waste words in demonstrating that such easements are usually reserved by the grantor in the hope that they will prove valuable to him in the disposition of his land. Being in derogation of the fee conveyed by the deed, such covenants will not be extended by implication to include anything not clearly expressed in them. [Zinn v. Sidler, 268 Mo. 680; Kitchen v. Hawley, 150 Mo. App. 497; Hutchinson v. Urich, 145 Ill. 336; Hartman v. Wells, 257 Ill. 167, 172; Hamnett v. Born, 247 Pa. St. 418; Johnson v. Jones, 244 Pa. St. 386.] The words 'clearly expressed,' as used by this and other courts, have no significance unless they mean that if a reasonable and substantial doubt is raised by the words employed in the covenant it must be resolved against the grantor. [Stone v. Pillsbury, 167 Mass. 332, and cases cited: Johnson v. Jones, supra; Grooms v. Morrison, 249 Mo. 544; Linville v. Greer, 165 Mo. 380.] It is only by such construction that such titles can be made certain, so that the use of lands conveyed in fee shall not depend upon the diverse opinions of judges as to the *minds* of the parties to the grant, but restrictions thereon shall appear plainly *written* in the grant.''

It follows that we cannot hold that the upper portion of this structure is not a ''porch'' within the meaning of that term as used in these restrictive covenants. and thereby condemn the structure as a whole as being an ''erection or obstruction'' prohibited by such covenants.

As to the character of the lower portion of the structure we regard it as altogether clear that, in the absence of the doors at the broad openings at the nor'h and south ends thereof, it constitutes nothing more than a covered driveway adjoining defendants' residence communicating with the latter by means of a doorway, and falls within the meaning of the term *porte-cochere* as that term is known locally and generally, and as it was so known when the restrictions were imposed upon

the property. As appears above, plaintiff's only expert witness testified that if the doors were permanently removed the structure would meet his definition of a *porte-cochere*. Likewise, absent the doors, if not other-- wise, it constitutes a *porte-cochere* within the definitions thereof given by the lexicographers, which need not be here set out. The testimony of defendants' experts goes farther and shows that the addition of the doors, so as to entirely enclose the driveway in inclement weather, does not make the thing any the less a *porte-cochere*. As we view it, the matter resolves itself into a question whether or not the decree below should be modified so as to require merely the permanent removal of these doors. We are quite satisfied that the decree should, in any event, go no farther; but we are not prepared to say that, under the evidence adduced, plaintiff is entitled to any decree in his favor.

The term *porte-cochere,* derived from *porte* (gate) and *cochere* from *coche* (coach), has been borrowed by us from the French. As to the meaning of the term as used in France, see Dictionary of Architecture & Building, by Russell Sturgis. It is said that "the use of the term, common in the United States, signifying a carriage porch, is erroneous." [Dict. of Arch. & Bld., supra.] The great weight of the expert testimony here adduced shows that the term, in this country, is not used exclusively to signify a carriage porch, defined by defendants experts. It appears that a *porte-cochere,* as we know it, may or may not be enclosed by gates or doors, the enclosed *porte-cochere* being well known in this country; and that a structure such as that here in question, with doors at front and rear, is architectuarl- ly termed a *porte-cochere.* Certainly, from the evidence, it cannot be said that it is an unusual or extraordinary thing to place doors upon a *porte-cochere,* even in this locality. Whether there was any difference in the term as locally used at the time of the trial and ap- proximately ten years prior thereto appears only from the testimony of defendants' experts. As shown above,

two of these witnesses unqualifiedly testified to the effect that the term *porte-cochere,* as used in the locality ten years prior to the trial, included a structure such as that here involved. Defendants' remaining expert witness, in the early part of his cross-examination, testified that ten or fifteen years prior to the trial a *porte-cochere* "would have been practically open on all sides;" but his subsequent testimony is to the contrary effect, and finally he stated that ten years prior to the trial he would unhesitatingly have called this structure a *porte-cochere.*

In view of this testimony, and having in mind the rule of law so well stated in Bolin v. Tyrol Inv. Co., supra, we are constrained to hold that a court of equity would not be warranted in ordering the permanent removal of these doors. Whether the term *porte-cochere,* as used in these restrictive covenants, is broad enough to include a covered driveway provided with doors so that it may be entirely closed, seems to us to be a matter by no means free from reasonable or substantial doubt. And if we are correct in this conclusion, it follows that this doubt must be resolved in favor of the defendants herein. In short, it appears that the 'grantor in' this trust agreement used, in this connection, words, viz., "porch" and *"porte-cochere."* which are somewhat elastic in their significance. In a sense the words are ambiguous or of doubtful import; and as said in the Bolin case, supra, the use of the land conveyed in fee to Nina C. Boogher cannot be made to depend upon the opinions of judges as to what was in the minds of the parties to the grant, when the character of the purported restrictions do not appear plainly written therein.

Nor do we think that the fact that Dr. Boogher's automobile is allowed to stand in this so-called *porte-cochere* while not in use suffices to warrant us in holding, under the evidence adduced, that the structure is, in effect, a garage and not a *porte-cochere.* We need not pass upon defendants' objection to the admissibility of such testimony. This fact alone cannot, we think, re-

move all reasonable and substantial doubt as to whether the structure falls within the term *porte-cochere* as used in these restrictive covenants.

Nor, under the circumstances, can the decree for plaintiff be sustained upon the theory that we ought to defer to the findings of the learned chancellor below, as argued by respondent. As said in Gibson v. Shull, 251 Mo. 480, 1. c. 485, 158 S. W. 322: "In equity cases our rule requires a full presentation of the evidence to this court for the very good reason that in such case the trial here is to the effect of a trial *de novo*. In other words, whilst we look upon the finding in the lower court as persuasive, we do not allow it to be binding, unless our minds run with the chancellor below on the facts, or unless the facts are conflicting and close and we yield to his judgment because of his better position to judge of the credibility of the respective witnesses." Furthermore, in our opinion the finding and judgment below are in contravention of the principles announced in Bolin v. Tyrol Inv. Co., supra.

Under the circumstances, it is unnecessary to notice the defense of laches set up below and argued here in the briefs of counsel.

The judgment is accordingly reversed and the cause remanded with directions to the circuit court to dismiss plaintiff's bill.

*Becker, J.*, concurs. *Reynolds, P. J.*, dissents, being of the opinion that the erection was not a *porte-cochere* but a garage and so used and its erection contrary to the restrictions of the deed.