THE HIATT INVESTMENT COMPANY, APPELLANT, v. E. A. BUEHLER, RESPONDENT.—16 S. W. (2d) 219.

Kansas City Court of Appeals. March 4, 1929.

*Harzfeld, Beach & Steeper* for appellant:

*Nourse & Bell* and *Henri L. Warren* for respondent.

BLAND, J.—This is an action for rent reserved in a lease executed by the defendant as tenant to plaintiff as landlord. Defendant filed a

counterclaim based upon a violation by plaintiff of a covenant in the lease and on allegations of fraud on the part of the plaintiff in procuring the lease. The jury found for the defendant on plaintiff's cause of action, and returned a verdict in the sum of $5500 on defendant's counterclaim. Plaintiff has appealed.

The lease was for a store room, occupied as a drug store, located at the northwest corner of St. John and Elmwood avenues in Kansas City. It was dated July 25, 1925, and was for a term of three years, beginning on August 1, 1925. Defendant vacated the premises in December, 1925. He paid the monthly rental of $160 for five months only ending on December 31, 1925. This suit is for $2380 the balance of the rent for the whole term, $800 having been realized by the plaintiff from rentals of the premises after defendant ceased paying rent. Defendant in his counterclaim prayed damages in the sum of $11,858.31 on account of the fraud alleged therein and a violation of a covenant of the lease wherein plaintiff agreed that there should be no other drug store in the holdings of plaintiff. There is no controversy but that defendant moved out of the premises and paid no rent after December, 1925, nor the amount for which defendant is liable under his lease provided he was not justified in abandoning the premises to plaintiff.

The facts in reference to the matter in controversy show that there was a small business center, consisting of about a dozen store rooms at the intersection of St. John and Elmwood avenues in Kansas City, facing St. John. These stores were owned by the plaintiff with the exception of a fire station located at the northwest corner of the intersection and which sets back some distance from St. John. The building and store room in question stands immediately west of the fire station and the latter being situated further to the north gave the store room some of the advantages of a corner location. There were houses located along the south side of St. John avenue immediately opposite the premises in question and the property south was restricted for residence purposes. The other store rooms at the intersection were leased or rented to various persons for other than drug store purposes, but the plaintiff owned a vacant lot at the southeast corner of the intersection which afforded the only location where possible competition to the drug store might be afforded.

The defendant became plaintiff's tenant in the drug store beginning in September, 1920, coming in under an unexpired lease of a former tenant. This lease expired at the end of June, 1923, at which time the rent was raised from $90 to $160. From this time until the execution of the lease in controversy defendant occupied the premises as a tenant from month to month. From the time the defendant went into the premises until he sold out his stock and fixtures the business increased from month to month.

The situation was such that the drug store was not near another competing drug store. When the matter of executing the lease in question came up between the parties defendant expressed fear to Mr. Sagehorn, the president of the plaintiff, that a building containing a drug store might be erected upon the vacant lot owned by the plaintiff. Defendant testified that there had been a rumor that plaintiff intended to sell the corner to some people who would erect a building to contain another drug store there. In his negotiation with Sagehorn defendant discussed this matter. Sagehorn testified that he brought up the question of the vacant lot but that defendant was not interested in anything but the twelve other existing store rooms at the intersection. Defendant testified that he knew the vacant lot belonged to the plaintiff and discussed the matter with Sagehorn, because there was a rumor that plaintiff was about to sell to someone who would erect a building there and open a drug store therein; that Sagehorn told the defendant that he would not permit any drug store on plaintiff's holdings; that "the estate was not financially able to build on it" (the lot); that "there would not be another business on that corner;" that "he had offered and been unable to sell it;" that "he could not sell it because the estate was in such shape that he could not sell it." (It seems that a stockholder of plaintiff had recently died.)

Thereafter Sagehorn drafted the lease and on July 25, 1925, brought it to defendant at the latter's store for his signature. The lease prepared by Sagehorn not having in it a clause protecting the defendant against the competition feared by him defendant called the circumstance to the attention of Sagehorn, who said, "well, you know me personally, that my word is good; that we cannot sell the land and haven't got the money to build on it." But defendant stated, "I am paying for protection and I would like to have the words put on the lease." Thereupon Sagehorn wrote the following at the end of the lease: "It is expressly understood that there is to be no other drug store in the holdings of the Hiatt Investment Company." and the lease was then executed by the parties.

Defendant testified that it was "considered by me and Sagehorn at the time the clause was inserted in the lease that the vacant lot there was a part of plaintiff's holdings." The lease was signed about noon and about six o'clock of the same afternoon defendant heard a rumor to the effect that plaintiff had either sold or was about to sell the vacant lot in question, "to some investor for a Piggly-Wiggly and the Crown Drug Company." Defendant made unsuccessful efforts to get in touch with Sagehorn for two days thereafter. When the defendant found Sagehorn the latter assured defendant there was nothing in the rumor; Sagehorn denied that plaintiff was selling the lot.

The testimony of Sagehorn himself shows that he entered into a contract (secret as far·as defendant was concerned) on behalf of plaintiff for the sale of the lot to one Jones two days before the lease was signed by the defendant. It was stipulated that the purchaser should erect a business building of a specified type but no restrictive covenant of any kind was mentioned. In the face of this the evidence of Sagehorn himself shows that he told defendant at the time the lease was signed, to the effect that the lot had not been sold; that if the finances of the plaintiff "were in such shape that we would not be forced to sell or vacate the ground, we would be glad to hold it, but if I had to go into it further and find we were short of money, that we would probably be forced to sell some of it."

One morning a few days after the lease was signed defendant observed some surveyors surveying the lot and setting stakes as if staking off a building. Defendant called up Sagehorn who said, "yes, I guess we are on a deal to sell the land with certain restrictions." Defendant asked him "how about·the restrictions," Sagehorn replied, "Well, we just had to do it or go into bankruptcy;" that plaintiff was hard pressed for money; that defendant should not be afraid of the coming of a drug store, because "we got an awful price for it;" that "the price of the land was so great that when the building had been erected the investment would be too great for a drug store to pay the rent."

The building was erected on the vacant lot and in November, 1925, the Crown Drug Company signed a ten year lease for one of the two-store rooms in the building. That the Crown Drug Company was going into the building to be erected on the vacant lot was understood in the neighborhood from a time beginning shortly after the signing of the defendant's lease. As soon as defendant learned that the Crown Drug Company (which the evidence shows operated "cut rate" drug stores underselling ordinary drug stores, such as defendants, and serious competition· for. them) was going into this building, he began to attempt to sell his drug store. He listed it with three brokers, one of whom had previously offered defendant on behalf of a client, $14,000 for the store. Moore and Simmons two of these brokers began sending customers to look at the store. Defendant asked $14,000 for it, the price he had before, in the spring of 1925, refused, but the prospective buyers would not pay that much in view of the character of competition to be afforded by the Crown Drug Company. Defendant then offered his store for $12,500 and then in the month of September for $10,500. No one could be found who was interested in buying the store under the conditions. Thereafter defendant's broker offered the stock to an agent of the Crown Drug Company for $8,500 cash and about a

week later he succeeded in selling it to that company for $8,500. This was for the sale of the stock and fixtures. The stock was removed shortly afterwards across the street to the premises of the Crown Drug Company. What became of the fixtures is not disclosed in the testimony.

Plaintiff contends that the court erred in permitting defendant to introduce oral testimony tending to alter, vary and change the written lease. This evidence had to do with the understanding between the defendant and Sagehorn in reference to the clause in the lease providing that "It is expressly understood there is to be no other drug store in the holdings of the Hiatt Investment Company," that is as to whether it was understood in the conversations relative to the making of the lease that defendant was to be protected from competition in the existing buildings or in a building that might be erected upon the vacant lot in question. However, plaintiff first introduced testimony upon this subject and it is not now in position to complain. Evidently it was the view of the plaintiff that the provision of the lease in controversy was ambiguous in reference to the question upon which the oral testimony was introduced. Otherwise it would not have introduced testimony tending to clear up this matter. Having tried the case on the theory that this character of testimony was admissible it cannot now urge a different theory. [Bammert v. Kenefick, 261 S. W. 78, 82.]

It is insisted that the court erred in giving defendant's instruction No. 6 which covered the entire case and directed a verdict for him on plaintiff's cause of action and defendant's counterclaim. In this connection it is first contended that the instruction is based on evidence erroneously admitted, but we have decided that the evidence in controversy was proper.

It is next contended that the instruction is erroneous for the reason that it authorizes a verdict based upon a sale of "the vacant lot" and "the vacant lot without a restrictive covenant." It will be more clearly understood what the plaintiff is contending under these heads by going into its argument in reference thereto. In this connection it is said, "there is no covenant restricting against a sale of any of the plaintiff's other property," and the restrictive covenant written in the lease at the time it was signed "applied only to the use of plaintiff's own holdings while in its own ownership and control and not to any use by subsequent owners;" the covenant in terms only concerned the *use* of the land and not its ownership either in fee or leasehold." It is true there is no covenant in the lease preventing the sale of the lot in question by plaintiff, but the covenant does, in our opinion, forbid such sale without proper provisions for the protection of the defendant against the coming of a drug store upon the premises sold. We do not think that the

covenant in question applies only so long as plaintiff continued to hold its property, but required it, when it sold any of its property, to see to it that no drug store should come into existence in or on it. In this connection it is claimed by the plaintiff that "restrictions on the use of land must be strictly construed." The general rule of construction applicable to a matter of this kind is stated in Williams v. Carr, 213 Mo. App. 223, 225, 226:

"It is held that the 'law favors the free and untrammelled use of real property. Restrictions in conveyances of the fee are regarded unfavorably and are therefore strictly construed.' [ Scharer v. Pantler, 127 Mo. App. 433, 437.]

" 'But, of course, the rule of construction thus stated is subject to that which obtains with respect to all contracts requiring the courts to give effect to the plain intention of the parties as gleaned from the language employed in the covenant when viewed in the light of the entire context of the instrument.' [Kitchen v. Hawley, 150 Mo. App. 497, 503.] In view of the law favoring the untrammelled use of property where the intention to create building restrictions is doubtful, the ambiguity will be resolved against the restrictions. [Whittaker v. Realty & Investment Co., 197 Mo. App. 377; Conrad v. Boogher, 201 Mo. App. 644.] It is stated in Land Company v. Investment Company, 169 Mo. App. 715, 722—

" 'Although restrictions on the fee are not favored, yet when the intention of the parties is clear, court will enforce them. [Hutchinson v. Ulrich, 145 Ill. 336; Kitchen v. Hawley, 150 Mo. App. 497.] The intention of the parties must be determined from the language of the covenant itself considered in connection with the surrounding circumstances at the time the covenant was made (Ibid); or, as it is sometimes said, from the langauage of the covenant itself considered in the light of the entire context of the instrument containing it. [Kitchen v. Hawley, 150 Mo. App. 497.] Such covenants must be considered with reference to the situation of the property affected and its present and prospective use as well as to the language employed in expressing the covenant. [St. Louis Deposit Bank v. Kenney, 101 Mo. App. 370, 1. c. 388.]' "

See also 36 C. J. 90, 91, 92:

"Restrictions in a lease for a term of years should be more favorably construed than those in a deed." [36 C. J. 92.]

It would appear to us that the language of the restrictive covenant under consideration upon its face, and taken in connection with the other parts of the written lease, shows that plaintiff covenanted not to permit any other drug store to come into its holdings during the term of the lease. There is nothing in the language used in the covenant indicating that plaintiff agreed merely that no other drug store should come in its holdings while title to such holdings

were in it. If the language of the lease and the covenant leave any doubt as to what the parties intended to cover in this respect, that doubt would be removed by reading the lease in the light of the situation surrounding the parties when it was executed. [Strates v. Keniry, 231 Mass. 426, 429; Waldorf Astoria Segar Co. v. Salomon, 95 N. Y. Sup. 1053, 1054.] In the Strates case the Cloverdale Company leased from the defendant a store room known as 423-425 Park avenue for five years. The lease provided that the lessee "should carry a general line of groceries, meats, provisions and fish." The company was then carrying on a similar business in defendant's building at 431 under a written lease. The lessor agreed that she would cause the fish market at 425½ Park avenue to be discontinued immediately, and that she would not, during the term of the lease, rent any other part of the building on the premises "for any grocery, provision, meat or fish business, except the Cloverdale Store now located at 431 Park avenue." The question before the court was whether or not the lessor in view of the provision of said lease violated said lease by afterwards renting 431 to be occupied for a competing business. The court said (l. c. 428, 429):

"If such were the intention of the parties presumably they would have expressly so stated. What they did in fact take out of the covenant was not 'No. 431 Park avenue' but the 'Cloverdale store' which was then 'located at' that place. There is nothing in the language they used which indicates an intention to permit the lessor to let the store numbered 431 for another competing grocery business after the Cloverdale Company should vacate the premises.

"*If the language itself left any doubt as to whether the parties intended entirely to exclude these premises from the operation of the covenant, that doubt would be removed by reading the lease in the light of the facts surrounding the parties when it was executed.*" (Italics ours.)

In the case at bar the evidence shows that the covenant covered the vacant lot as well as the store buildings already in existence. Defendant was desirous of being protected against competition of a drug store upon the vacant lot during the term of his lease. It would be immaterial to him who owned the lot, whether plaintiff or plaintiff's grantees or lessees. We have no doubt that the covenant required plaintiff to take means to prevent the coming of a drug store upon the vacant lot during the existence of the lease.

In the case of University Club v. Deekin, 265 Ill. 257, the lease provided that the lessee should use the leased room for a jewelry and art shop and for no other purpose. It also contained the following clause numbered 12:

"Lessor hereby agrees during the term of this lease not to rent any other store in said University Club building *to any tenant mak-*

*ing a specialty* of the sale of Japanese or Chinese goods or pearls." (Italics ours.)

Shortly after making this lease the landlord leased to one Sandberg, a room in the University building, two doors from the corner. The following provision was inserted in the Sandberg lease:

"It is further distinctly understood and agreed by and between the parties hereto that at no time during the term of this lease will the lessee herein use the demised premises for a collateral loan or pawnshop or make a specialty therein of the sale of pearls."

The evidence shows that Sandberg made a specialty of the sale of pearls in connection with the conduct of his jewelry business from the time that he took possession of the room leased to him; that Deakin vacated the premises and surrendered possession because of the failure of the lessor to enforce the 12th clause of his lease. The court held that the lessor had violated the lease in not enforcing the 12th clause and that the lessee Deakin was justified in rescinding the lease.

In the case at bar we think that the plaintiff violated the covenant in question in the lease by not providing against the coming of a drug store in the building to be erected upon the vacant lot. [Snavely v. Berman, 121 Atl. 842; Norman v. Wells, 17 Wend. (N. Y.) 136; University Club v. Deakin, supra.] Although plaintiff had a perfect right to sell the lot, the evidence shows that it made no provision whatever against a drug store being located in the store building contemplated in the sale. In fact the contract of sale was made before the lease was executed and apparently plaintiff had already put out of its power the right to control the use of the lot for a competing drug store.

We have examined plaintiff's cases and find them not in point. In the case of Postal Tel. Co. v. Western Union Tel. Co., 155 Ill. 335, the court held that a covenant in the lease that "during said term the lessor will not lease offices in said building to any other telegraph company for use as a telegraph office, without consent of the lessee," was not violated by the *sale* of the building by the lessor, "subject to the existing leases, held by the tenants," when the grantee itself opened and maintained a telegraph office in the building. In that case the covenant was against the leasing and not against the sale of the building. Here the covenant did not specify either a lease or sale, but required the lessor to see to it that no drug store came in its buildings. This language covered both a lease and a sale. For these reasons we think that the cases of Kemp v. Bird, L. R. 5 Ch. Div. 974; Carr v. King (Cal.), 142 Pac. 131; Lucente v. Davis, 101 Md. 526, and similar cases cited by the plaintiff are not in point. The covenant in the case at bar is more like that in the case of University Club v. Deakin, supra.

It is claimed that the instruction is erroneous in that it authorizes a verdict for the defendant, "If a building was thereafter erected on said lot and a drug store installed therein;" that there was no covenant against a building merely, and there is no evidence that it was occupied by a drug store prior to defendant's abandonment of his own store. A similar contention is made in reference to another point raised by the plaintiff, that is, that there is no evidence of a breach by plaintiff "under any theory of damages." In support of this contention plaintiff cites the case of Norman v. Wells, supra. There the court made a distinction between a covenant relating to title and one merely to possession or manner of enjoyment; the covenant involved in the case at bar is of the latter character. In the Norman case the court said:

"It is on the latter clause of the covenant that the defendant should not establish the place for sawing mahogany. Surely that was not done till the mill was put in motion; or the lessee or his assignee the plaintiff had felt the consequences, or at least, till the mill was actually erected with the avowed intent to employ it for that purpose. I admit there is some nicety in the distinction between covenants going to the title and those which go to the enjoyment; but it is well established."

The evidence in the case at bar in reference to the installing of a drug store by the Crown Drug Company is as follows: Sagehorn testified that he had a conversation with the defendant the first week in December, 1925, in which he asked the defendant if he had sold his drug store and the defendant replied in the negative; that the contents of the drug store were removed about a week befor Christmas, 1925; that he thought that the first time he knew that the Crown Drug Company was putting in a store was "when I saw their sign going up." It is apparent from this testimony that when the Crown Drug Company was putting or had put in a store, Sagehorn saw the sign going up and he afterwards asked the defendant if he had sold out and defendant replied that he had not. Sagehorn later testified that he saw the sign going up about the first week in December; that defendant denied that he had sold his store, and that the stock was moved about two or three weeks afterwards.

Defendant testified that the Crown Drug Company signed its lease in November; that his goods were moved to the Crown Drug Company shortly after he sold them to it. He further testified that when Sagehorn inquired of him as to whether he sold his store he told Sagehorn that he had not, but he also informed him that "he was on a deal, but I have not sold," and as a matter of fact he was trying to sell it at that time. Defendant testified that he had another conversation with Sagehorn in November, 1925, which was

"just before we sold." In connection with defendant's cross-examination it was admitted by both sides that Sagehorn and defendant knew that the Crown Drug Company store was going into the premises at the time Sagehorn inquired of the defendant whether he was going to sell and defendant denied that he was.

It appears from this testimony that Sagehorn saw the sign of the Crown Drug Company going up before he asked defendant if the latter was selling his store, and at the time of such inquiry defendant had not actually sold his store. Sagehorn testified that he knew the Crown Drug Company was putting in a store when he saw the sign going up; that the sign went up two or three weeks before defendant's goods were moved, and it was further shown that the goods were moved, shortly after they were sold. From this testimony the jury could have found that when the sign went up the Crown Drug Company was putting in a store, the evidence showing that the company had theretofore signed a ten year lease. It could have well found that the building had been erected and that the Crown Drug Company had at least reached a stage in its plans, when defendant sold out, involving an avowed intent to employ it for that purpose, that is; for the purpose of a drug store within the meaning of the case of Norman v. Wells, supra.

Aside from the foregoing considerations, plaintiff's contentions in reference to defendant's instruction No. 6 are all based upon the theory that defendant was not entitled to recover under his counterclaim, yet plaintiff did not offer any demurrer to the evidence at the close of all of the evidence as to the counterclaim, but joined in with defendant in submitting to the jury the right of defendant to recover by offering and having the court give its instruction No. 5, which reads as follows:

"The court instructs the jury that before you can find for the defendant on his counterclaim you must first find by a preponderance of the evidence that under all the facts in evidence said defendant was justified in selling his said business and refusing thereafter to pay any rent."

In addition to this plaintiff's instruction No. 1 which was upon plaintiff's theory of recovery under plaintiff's cause of action for rent, told the jury that under the facts therein submitted plaintiff was entitled to recover for rent "if you also find under all the facts in evidence that the defendant was not justified in removing from said premises." Plaintiff not having offered any demurrer to the evidence, and having joined with the defendant in instructing the jury on the theory that defendant was entitled to recover under his counterclaim if he was justified in selling his business and removing from the premises, is now estopped to contend that defendant was

not entitled to at least some recovery under his counterclaim. [Torrance v. Pryor, 210 S. W. 430, 433.]

It is contended that the court erred in giving defendant's instruction No. 7, which is on the measure of damages under defendant's counterclaim. This instruction submitted that the loss, if any, was the depreciation of the value of defendant's store. It is contended that in view of the fact that the average sales did not decrease after the lease and up until the time the defendant sold out, the measure of damages, if any, was the loss in the value of the leasehold. We think there is no merit in the contention that the measure of damages was the loss in the value of the leasehold. In addition to this it would appear that the case was not tried upon the theory now advanced by the plaintiff. [See Davidson v. Transit Co., 211 Mo. 320, 358.] While objection was made to defendant proving any damages on the ground that he was not entitled to recovery at all, no objection was made as to the method by or theory upon which defendant proved his damages. Plaintiff in rebuttal accepted the theory of damages advanced by defendant in his testimony, to-wit · that his measure of damages was the decrease in the value of the business, plaintiff's testimony tending to show that the business did not decrease as much as defendant's witnesses testified. In this connection it was brought out by plaintiff that the depreciation of the business by reason of the fact that the Crown Drug Company went in across the street from defendant's store would be thirty-five per cent. In this connection plaintiff caused the court to give its instruction No. 2 which reads as follows:

"The court instructs the jury that the evidence in regard to loss of profits in support of defendant's counterclaim is offered for the sole purpose of showing the value of defendant's merchandise and fixtures and drug business and not for the purpose of recovering in the case as profits. You are therefore instructed that any and all of such evidence shall be considered by you only in relation to what defendant claimed his store was actually worth."

No instruction was offered upon the proposition that defendant could recover, if at all, only upon the theory that his measure of damages was the loss in the value of the leasehold.

However, in any event defendant was not required to submit his measure of damages on the theory that the true measure thereof was the loss in the value of the leasehold. No doubt that kind of loss would be that naturally or normally arising in consequence of the violation of the covenant, but defendant was not confined to such damages. [McCready v. Bullis, 210 Pac. 638; Brewington v. Loughran, 138 N. C. 558, 564, 565.] In Sloan v. Paramore, 181 Mo. App. 611, 620, the court said:

"There can be no doubt that the rule of Hadley v. Baxendale, besides authorizing the recovery of such damages as normally result

from the breach of the contract, authorizes, in addition, the recovery of such damages as may fairly be supposed to have entered into the contemplation of the parties when they made the contract—that is, such damages as might naturally be expected by them to follow the breach in the particular case.''

In Blagen v. Thompson, 18 L. R. A. 315, 320, 321, it is said:

''The rule that damages which are uncertain or contingent cannot be recovered does not embrace an uncertainty as to the value of the benefit or gain to be derived from the performance of the contract, but an uncertainty or contingency as to whether such gain or benefit would be derived at all. It only applies to such damages as are not the certain result of the breach, and not to such as are the certain result, but uncertain in amount.''

A recovery by defendant herein of the rental value of the premises would not have been fully compensatory. We have examined the cases cited by the plaintiff and find that they involve breaches of a covenant that did not go to the whole consideration of the contract, but were subordinate and incidental. [See Brewington v. Loughran, supra; Union Pac. Ry. v. Travelers' Ins. Co., 83 Fed. 676; Roth Tool Co. v. Spring Co., 146 Mo. App. 1; Obermyer v. Nichols (Pa.), 6 Am. Dec. 439.]

In the case of Frankfort & Cinn. Ry. Co. v. Jackson, 153 Ky. 534, 543, cited by the plaintiff, the court said, ''here the contract between Jackson and the Frankfort & Cinn. Ry. Co. was a mere incident to his business and did not involve the whole of it.'' In Metzger v. Brincat (Ala.), 45 So. 633, the damages were assessed as per stipulation entered into between the parties and the tenant wanted to continue in the premises. The covenant in the case at bar goes to the whole consideration, it was not merely incidental to the main purposes of the lease and defendant elected to surrender the lease. The evidence shows that the lease would not have been executed if it had not been for the insertion of the restrictive covenant in it; that it was vital to the protection of defendant's business. It was said in the case of University Club v. Deakin, supra, l. c. 262:

The lessee ''contracted with the defendant in error (the lessor) for the sole right to engage in this specialty in its building, and if defendant in error saw fit to ignore that provision of the contract and suffer a breach of the same, plaintiff in error had the right to terminate his lease, surrender possession of the premises and refuse to further perform on his part the provisions of the contract.''

Defendant herein had a choice of several remedies: (1) He could rescind the lease, in which case he would not have been required to pay any further rent; (2) He could have continued under his lease and at the end of the term sued for loss of the profits suffered by rea-

son of the competition of the Crown Drug Company; (3) He could have treated the violation of the covenant by the plaintiff as putting an end to the contract for purposes of the performance and sued for damages. [Lakeshore & M. S. Ry. Co. v. Richards, 152 Ill. 59, 80; Laswell v. Handle Co., 147 Mo. App. 497, 527, 528; Mfg. Co. v. McCord, 65 Mo. App. 507; Roehm v. Horst, 178 U. S. 1, 20, 21; Central Trust Co. v. Chicago Auditorium Asso., 240 U. S. 581, 589; Colo. Yule Marble Co. v. Collins, 230 Fed. 78; Richmond & Jackson v. D. & S. C. R. Co. et al., 40 Ia. 264; 13 C. J., pp. 651, 653.] Defendant has elected to pursue the last course and his measure of damage was not necessarily the loss of rental value. [See cases last cited and McGready v. Bullis, supra.]

The case of Brewington v. Loughran, supra, cited by the plaintiff is not in point, as it involves a different character of breach. Defendant was not required to sue for the loss in the value of the leasehold but was entitled to recover the actual damages sustained by him by reason of the breach of the covenant on the part of the plaintiff. We are not required to decide whether the proper measure of damages was the depreciation of the business or loss of prospective profits, as it is not contended by the plaintiff that if the defendant is entitled to recover anything, other than the loss of the value of the leasehold, the theory upon which he actually recovered was not a proper one. In fact plaintiff is not in position to now contend that loss of profits was the proper measure of damages in view of plaintiff's instruction No. 2 which told the jury in effect that they could not find for the defendant for any loss of profits.

It is contended that the evidence fails to show that defendant suffered any depreciation of his business; that there is no evidence of the value of the store prior to the time of the breach, and that the most the evidence shows is that defendant was offered $13,500 in 1924 for the store and $14,000 in 1925, and that there is not only no evidence as to the original value of the store but as to the amount of the depreciation. In addition to the evidence showing that defendant received the offers referred to, the testimony of a drug store broker of years of experience shows that the store was actually worth $14,000 at the time the offer was made, which defendant testified was shortly before his lease was executed. While plaintiff claims that the opinions of the witnesses on the question of value were not proper, it is clear that there is no merit in this contention. [Thomas v. Mallinckrodt, 43 Mo. 58, 65; Mathews v. R. R., 142 Mo. 645, 666, 667; Wiggins v. St. L. M. & Se. Ry., 119 Mo. App. 492, 494.]

As to the value of the goods at the time they were sold the evidence shows that they were not only actually sold for $8,500, but that this was the best price under the conditions that could have been obtained for the stock and fixtures. This was testified to by

the witness Moore, a drug store broker in Kansas City, and without objection on the part of the plaintiff. The evidence shows that efforts were made to obtain more for the stock and fixtures; that they were at first offered for $14,000, then $12,500, then $10,500 and that no one would buy the stock on account of the threatened competition by the Crown Drug Company; that finally the stock was sold for $8,500, which, as stated before, was the best sum that could be obtained under the conditions. Under these facts we think there was sufficient evidence to show that there was a depreciation in the sum of $5500, the amount of the verdict, by reason of plaintiff's breach of the covenant. [See Jackson v. Western Union Tel. Co., 174 Mo. App. 70; 23 C. J. 57.]

It is true that no inventory of the stock and fixtures was taken, but the evidence shows that the principal thing to be considered in fixing the value of a drug store of this kind, is not the fixtures and stock, but "the location, the lease and the volume of business;" that the question of competition has a bearing on the question of location; that a drug store located with nearby competition is not as well located as one without competition. The evidence shows that it is not necessary to take an inventory in the sale of a drug store of this nature, but a sufficient estimate of the value of the stock can be made by looking at the stock; that the "average druggist that has been in business a number of years can make a fairly close estimate" "by just looking at it."

Plaintiff insists that there is a "complete lack of evidence from which the jury might find the extent, if any, of the alleged depreciation" and in this connection there was evidence that the fixtures alone were worth $6500, which shows that the stock was worth only $2000 at the time of the sale, and as there was other evidence that the stock alone was worth $5000 to $5500 at the time of the $14,000 offer, plaintiff says that it is conclusively shown that there was a substantial voluntary reduction in the stock from the time the $14,000 was made until the time of the sale. If there is any merit in this argument it merely goes to the question as to the amount of the verdict, and as there was no complaint in plaintiff's motion for a new trial that the verdict was excessive it cannot urge such a point here.

The fact that the final sale did not contain elements of the good will of the running business or the lease has no bearing upon the matters under defendant's theory of the case. Defendant was entitled to treat the matter as though the lease was at an end, and if this was true, there was not only no lease to sell but no good will attached to the business as a running business. It is complained that the sale did not contain any of the three factors that the testimony shows constitutes the principal value of a drug store business.

All three of these factors were materially injured by plaintiff's conduct when it permitted not only a competing drug store to come in but a "cut rate" store which naturally affected the value as to location. Defendant abandoned the lease, leaving there no business to be judged by its volume. As before stated by reason of the conduct of plaintiff, defendant had a right to treat the lease as at an end and sell out his business. The fact that he could not sell the things that the plaintiff claims he should have sold gives rise, in a large measure, to defendant's damages for which plaintiff itself is responsible. It is claimed that there is no evidence of fraud, but fraud was not submitted to the jury in plaintiff's instructions. [Dietzman v. St. Louis Screw Co., 254 S. W. 59, 65.]

It is claimed that there is no evidence justifying a verdict for the defendant on plaintiff's cause of action. In reference to this point it is said that defendant "cannot claim benefits under the contract while it is disclaiming its obligations." This is without merit. Defendant did not elect to rescind the contract or lease. He treated the contract as ended when plaintiff breached the covenant, so far as performance was concerned. He had a right to treat the violation of the covenant as a total breach, abandon the lease and sue at once for any damages which he may have sustained. [15 C. J. 651, 653; Laswell v. Handle Co., supra.]

It is contended that the court erred in giving the instruction on the form of the verdict. We find that this instruction authorizes a finding for the defendant on plaintiff's cause of action, but it is claimed that it was error to give it "without qualifying instructions as to what facts the jury must find to justify a verdict for defendant." Plaintiff procured the court to give its instruction telling the jury what was necessary for them to find in order to return a verdict for the plaintiff. If plaintiff wanted the negative of the proposition submitted to the jury it should have asked an instruction along that line.

It is claimed that plaintiff's breach did not justify the defendant in abandoning the premises and suing for damages, without first putting plaintiff in default by affording him a reasonable opportunity, after notice, to comply with the terms of his covenant. There is no merit in this contention. [13 C. J. 653, 657, 658; Browning v. No. Mo. Central, 188 S. W. 143, 151; Mfg. Co. v. McCord, 65 Mo. App. 507; Central Trust Co. v. Chicago Auditorium Co., supra, l. c. 589; Colo. Yule Marble Co. v. Collins, supra.]

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.