[L. A. No. 18387. In Bank. Dec. 23, 1942.]

MEDICO-DENTAL BUILDING COMPANY OF LOS AN-
GELES (a Corporation), Appellant, v. HORTON &
CONVERSE (a Corporation), Respondent.

412

Louis M. Lissner and Laurence M. Weinberg for Appellant.

Paul Vallée and J. Harper Shoop for Respondent.

CURTIS, J.—Plaintiff brought this suit for rent alleged to be due under a lease, for the amount of an electricity charge against defendant during the last month of its occupancy of the premises, and for money expended for renovation following the defendant's removal. A trial was had before the court without a jury, and findings were made in favor of the defendant pursuant to its claim that plaintiff's breach of a restrictive covenant in the lease, which violation was not waived by the defendant, prevented the maintenance of this action except as to the expenditure for electricity as alleged in the complaint and admitted in the answer. From the judgment rendered accordingly for defendant except as to the mentioned electricity item, plaintiff has taken this appeal.

On July 1, 1934, defendant, Horton & Converse, as lessee, entered into a written lease covering certain space on the ground floor of the Medico-Dental Building at Eighth and Francisco Streets, Los Angeles, for a term of sixteen years and four months, at a minimum monthly rental of $600 for the part of the term concerned herein, and a fixed percentage of the gross sales. At the time the lease was made, defendant was in possession of the premises, having occupied them since 1925 under a prior lease. As successor in interest by

virtue of an assignment of the lease involved herein, plaintiff, Medico-Dental Building Company, stands in the position of the original lessor.

The lease provided that the premises should be "used and occupied by lessee as a drug store and for no other business or purpose, without the written consent of lessor." It also contained the following stipulation: "Lessor agrees not to lease or sublease any part or portion of the Medico-Dental Building to any other person, firm or corporation for the purpose of maintaining a drug store or selling drugs or ampoules, or for the purpose of maintaining a cafe, restaurant or lunch counter therein during the term of this lease."

On December 30, 1937, plaintiff leased the entire ninth floor of the same building to one Dr. Boonshaft, a physician, for a term of three years commencing April 15, 1938. This lease contained the following provisions: "The premises demised hereby are to be used solely as offices for the practice of medicine and dentistry, and lessee agrees that he will not maintain therein or thereon, nor permit to be maintained therein or thereon, a drug store or drug dispensary, nor will lessee compound or dispense, or permit to be compounded or dispensed, drugs or ampoules except in connection with the regular course of treatment of lessee's own patients. Lessee agrees not to display any sign or advertisement on the inside or outside of the demised premises, or the building of which the demised premises are a part embodying the words 'Pharmacy,' 'Drug Store,' 'Dispensary' or words of like import. Lessee understands that lessor has heretofore executed a lease to Horton & Converse granting to said Horton & Converse the exclusive privilege of conducting a drug store business on the ground floor of said Medico-Dental Building, and lessee agrees that he will not do, or permit to be done, anything in connection with the premises demised hereby which would in any way conflict with or constitute a breach by the lessor therein of said Horton & Converse lease."

Dr. Boonshaft went into possession under his lease on April 15, 1938, and occupied the entire ninth floor of the building, where he had from thirty-two to thirty-six treatment rooms and had six to eight doctors associated with him in an organization known as the Boonshaft Medical Group. Independent of this staff but subject to frequent call to the premises in the course of the work of this enterprise were some thirty

consultant doctors. The plan of operation of the medical organization was to register groups of employees and lodge members and their families for medical treatment on the basis of a monthly charge per family; registration and payment of the fixed sum entitled the patient to receive, among other things, certain drugs, but additional charges were made for other medicines. Dr. Boonshaft maintained a drug room wherein drugs were sold and prescriptions filled per the order of the regular staff or the consultant doctors in the treatment of patients of the Medical Group. He obtained a pharmacy license on May 10, 1938. Until June 25 of that year he bought his drugs from defendant's store *in the building*. However, he objected to the sales tax charged in connection with such purchases, and on June 25, 1938, he commenced buying wholesale from defendant's wholesale department *at another location*, which source of supply he continued to patronize to the time of trial.

The order of pertinent events as set forth in the trial court's findings may be summarized as follows: During the month of May, 1938, a drug store in charge of a registered pharmacist was opened and maintained on the ninth floor of the Medico-Dental Building, which said drug store was registered as a pharmacy with the California State Board of Pharmacy; there drugs were sold, and prescriptions were compounded and filled, and a charge was made therefor. On July 8, 1938, a sales tax permit was issued to Dr. Boonshaft. During the last week of July, 1938, defendant learned of these facts as to the operation of the drug store, and on August 3, 1938, it notified plaintiff in writing of its discovery of these matters and charged that such practice constituted a breach of its lease (an express demand being made in the letter that plaintiff take immediate steps to stop the objectionable selling of drugs and the compounding and filling of prescriptions). During the time between August 3 and August 31, 1938, the drug store continued to operate as before. Agents of plaintiff had conferences relative to defendant's objection, but such discussions were not communicated to defendant and defendant had no knowledge of plaintiff's disposition regarding its complaint except as manifested at a meeting held in defendant's office on August 8, 1938, at which time plaintiff advised defendant that it would take the matter up further and see what it could do about it and advise defendant. Defendant did not have any further communication from plain-

tiff concerning the objection to the drug store until August 19, 1938, when the attorney for plaintiff informed defendant that no arrangements could be made with Dr. Boonshaft and plaintiff could not do anything with him; in reply on that occasion defendant, through its president, said that it was going to vacate the premises in order to avoid a waiver of its exclusive right to maintain a drug store and sell drugs in the building. (The record shows that plaintiff's attorney then responded: ''Well, use your own judgment about that.'') Plaintiff failed thereafter to take any further action. (The next day defendant closed its store, placed a sign on the door announcing service was available at one of its other locations, and piled empty packing boxes at the entrance and on the main part of the floor of its leased premises in the Medico-Dental Building for the purpose of impressing plaintiff with its intention to move.) On August 24, 1938, defendant sent plaintiff a written notice of rescission and vacated the store on August 31, 1938.

In line with this chronology the trial court found that plaintiff by executing the lease with Dr. Boonshaft did demise a part of the Medico-Dental Building to a tenant other than defendant for the purpose of maintaining a drug store and selling drugs on the premises, and that the making of the lease with Dr. Boonshaft was a breach of defendant's lease; that plaintiff in not taking immediate action to abate the drug store on the ninth floor of the building violated its lease with defendant; that plaintiff breached its lease with defendant on August 19, 1938, when it advised defendant that it could make no arrangements with Dr. Boonshaft and could not do anything with him regarding the selling of drugs and the maintaining of the drug store; and that such breaches of the lease were in material respects and were not waived by defendant.

The court also found that a material part of the consideration which induced defendant to enter into the lease with plaintiff was the right to be protected against competition, and that a material part of the consideration failed as the result of plaintiff's execution of the Boonshaft lease.

The court further found that it was not true that defendant or any person on behalf of defendant, assisted or encouraged Mr. Binder, the business manager of the Boonshaft Medical Group, or anyone to establish or maintain a drug

store, or sell drugs, in any part of the Medico-Dental Building other than the premises demised by plaintiff to defendant; that it was not true that Mr. Walsh, defendant's vice-president, informed Mr. Binder that it would be necessary to obtain a pharmacy license or a sales tax permit, or that he would assist in or outline a procedure for securing such license or permit.

On this appeal from the judgment rendered for defendant in consequence of the above findings, plaintiff advances the following propositions: (1) Covenants in leases are independent and performance of a covenant by the landlord is not a condition precedent to an action for rent against the tenant; (2) a covenant "not to lease" for a restricted purpose is breached only by actual leasing for such purpose, or by acquiescence in the conduct of the second lessee which is in violation of the restriction, neither of which appears in this case; (3) even if the covenants are dependent and there was a breach of the covenant involved herein, the breach was not so substantial as to go to the whole of the consideration; and (4) there was a waiver by the defendant of the alleged violation. Consideration of the legal aspect of these respective contentions in conjunction with the factual situation which confronted the trial court will demonstrate the propriety of the judgment entered.

The first controversial point is whether the covenants "not to lease" and "to pay rent" are mutually independent or dependent. It is plaintiff's position that a lease is a conveyance as distinguished from a contract, so that any covenant on the part of the lessor is independent of the lessee's obligation to pay rent and each party has his remedy for breach of covenant in an action for damages. ▇ While it is true that a lease is primarily a conveyance in that it transfers an estate to the lessee, it also presents the aspect of a contract. (Pollock on Contracts, Third Am. ed., p. 531.) This dual character serves to create two distinct sets of rights and obligations—"one comprising those growing out of the relation of landlord and tenant, and said to be based on the 'privity of estate,' and the other comprising those growing out of the express stipulations of the lease, and so said to be based on 'privity of contract.'" (*Samuels* v. *Ottinger*, 169 Cal. 209, 211 [146 P. 638, Ann.Cas. 1916E, 830].) ▇ Those features of the lease which are strictly contractual in their nature should be construed according to the rules for the inter-

pretation of contracts generally and in conformity with the fundamental principle that the intentions of the parties should be given effect as far as possible. (*Realty & Rebuilding Co.* v. *Rea,* 184 Cal. 565 [194 P. 1024]; *Edward Barron Estate Co.* v. *Waterman,* 32 Cal.App. 171 [162 P. 410]; *Lang* v. *Pacific Brewing etc. Co.,* 44 Cal.App. 618 [187 P. 81]; *Kurihara* v. *City Market of Los Angeles,* 90 Cal.App. 374 [265 P. 987]; 15 Cal.Jur. § 31, p. 625.) In line with this concept is the authoritative observation in 32 Am.Jur. § 144, p. 145, that ''covenants and stipulations on the part of the lessor and lessee are to be construed to be dependent upon each other or independent of each other, according to the intention of the parties and the good sense of the case, and technical words should give way to such intention.''

　■　Noteworthy here are the several provisions of the lease itself plainly indicating the intention and understanding of the parties as to the interbalancing considerations existing between the respective covenants. The agreement by the lessor ''not to lease'' any other part of the building to any other person for the purpose of its use as a drug store or for the sale of drugs, and the agreement by the lessee ''to pay rent'' appear in a rider attached to and made a part of the lease, a circumstance of incorporation not to be overlooked in the measure of the parties' comprehension of the reciprocal nature of the specified promises. Moreover, the lessee was limited by the terms of the lease to maintaining a drug store, a restriction emphasizing the import of the lessor's duty in negotiating future demises of other portions of the building. Finally to be noted is the express language of the lease manifesting the conditional character of the stipulations therein contained: ''Time is of the essence of this lease and all of the terms and covenants hereof are conditions, and upon the breach by lessee of any of the same lessor may, at lessor's option, terminate this lease . . . '' Thus, the parties recognized in plain terms the essential interdependence of their obligations.

　■　It is an established rule that those covenants which run to the entire consideration of a contract are mutual and dependent. (*Brennan* v. *Ford,* 46 Cal. 7; *Ernst* v. *Cummings,* 55 Cal. 179; *Osborn* v. *Henry Cowell Lime etc. Co.,* 37 Cal. App. 67 [173 P. 492]; 7 Cal.Jur. § 7, pp. 717-718.) Undoubtedly the restrictive covenant in defendant's lease was of such

a nature. ▉ The exclusive right to conduct a drug store in the building was vital to defendant's successful operation of its business under the circumstances which prevailed in this case. Defendant's pharmacy was of a distinctive type in that it catered principally to doctors and dentists for reference of prescription work, did not carry the general line of merchandise found in the ordinary drug store, and did not rely upon transient trade. Defendant was and had been maintaining a chain of exclusive prescription pharmacies in Los Angeles for eighteen years. The fact that the Medico-Dental Building was tenanted for the most part by practitioners of the medical and dental professions motivated defendant to select that location for the establishment of one of its retail units. Defendant had occupied the same premises since 1925, and depended upon the tenants of the building and their patients for the major portion of its business. In fact, when vacancies occurred defendant's income from the store suffered to such an extent that the rent was temporarily reduced, and restoration to the former monthly rental level was made contingent upon a material increase in the occupancy of the building. Thus plaintiff knew, as appears from its letter granting the rent concession to defendant, that the "chief source" of defendant's business on the premises was the tenants in the building, and that it was therefore of prime importance that no competitor be rented quarters there. The correlation of these facts with the express provisions of the lease above noted compels the conclusion that the restrictive covenant was not incidental or subordinate to the main object of the lease, but went to the whole of the consideration, and that as such it must be deemed a dependent covenant.

In support of its argument that it is the unvarying rule in this state that all covenants in leases are independent, plaintiff cites two California cases: *Arnold* v. *Krigbaum,* 169 Cal. 143 [146 P. 423, Ann.Cas. 1916D, 370], and *Exchange Securities Co.* v. *Rossini,* 44 Cal.App. 583 [186 P. 828]. Neither of these is authority for the broad proposition advanced by plaintiff, and each presents a factual situation quite different from that involved here. The first case, *Arnold* v. *Krigbaum, supra,* was an action in *unlawful detainer,* and to recover the amount of rent due. It was held that a counterclaim for damages for failure to make repairs could not be asserted in such proceeding. The decision is predicated upon

the principle that the unlawful detainer act was intended to provide a summary remedy for the restitution of the possession of premises withheld by tenants in violation of the covenants of their leases, which statute would be frustrated and rendered wholly inadequate by the interposition of the defenses usually permitted in ordinary cases of law. Thus, whether the parties' respective promises were independent or dependent did not enter as a factor in the determination of the case. However, plaintiff directs particular attention to the court's language at p. 145: ''A covenant to repair on the part of the lessor and a covenant to pay rent on the part of the lessee are *usually* considered as independent covenants, and unless the covenant to repair is expressly or *impliedly* made a condition precedent to the covenant to pay rent, the breach of the former does not justify the refusal on the part of the lessee to perform the latter.'' (Italics ours.) Regardless of the immateriality of this statement to the disposition of the unlawful detainer proceeding, such observation by its qualifying tenor indicates that there may be circumstances in which a particular covenant, even one to make repairs, may be dependent without an express stipulation in the lease to that effect.

The second case, *Exchange Securities Co.* v. *Rossini, supra,* concerned the relationship between the covenants ''to give an option to purchase the leased property'' and ''to pay rent.'' The lessees vacated the premises some five months after the sale thereof by the lessor without notice to them as specified by the lease. In consequence of the lessees' refusal to resume possession for the balance of the term, the new owner of the property, as successor in interest of the original lessor, sued for the rent accrued after the abandonment of the leased premises. The sole point in controversy was whether the breach of the lessor's covenant warranted the lessees' course of action. It was there stated that the violation of an independent covenant by the landlord will not justify the tenant's termination of the lease in the absence of a stipulation therein to that effect. Since such provision was not in the lease, it only remained for the court to consider whether the covenant to give an option to purchase was independent or dependent. The court in its opinion stated at p. 586: ''Our conclusion is that the covenant in question on the part of the lessor was *in its nature independent* and not a condition pre-

cedent to the payment of the rent by the lessees. . . . ''
[Italics ours.] It is clear that the lessees' enjoyment of the
premises was not affected in any way by the lessor's refusal
to give the lessees an opportunity to purchase the leased prop-
erty. The covenant *in its nature* was plainly collateral to and
independent of the principal agreement to convey a leasehold.
However, such ruling, like the principle of the prior case, is
entirely compatible with the conclusion that covenants in
leases may be dependent where, as in the present situation,
the parties in making their agreement inserted provisions
which, when related to the then existing situation, so indicated
their intention.

While the precise question of whether upon the breach of
the lessor's restrictive covenant "not to lease," the lessee is
entitled to vacate the premises without further liability for
payment of rent appears to be one of first impression in this
state, the point has been considered in other jurisdictions. In
the case of *University Club* v. *Deakin*, 265 Ill. 257 [106 N.E.
790, L.R.A. 1915C, 854], the landlord brought an action to
recover rent for a store room. The lease provided that the
lessee, Deakin, should use the leased room for a jewelry and
art shop, and for no other purpose. It also contained the fol-
lowing clause: "Lessor hereby agrees during the term of this
lease not to rent any other store in said University Club build-
ing to any tenant making a specialty of the sale of Japanese
or Chinese goods or pearls." Subsequently the landlord leased
a room in the building to one Sandberg, who expressly agreed,
according to the terms of his lease, that he would not use the
demised premises for a collateral loan or pawn shop, or make
a specialty therein of the sale of pearls. The evidence showed
that from the time Sandberg took possession of the room
leased to him he had made a specialty therein of the pro-
hibited line of merchandise in connection with the conduct of
his jewelry business; that Deakin vacated the premises and
surrendered possession because of the failure of the lessor to
enforce the above-quoted provision of his lease. In its dis-
cussion of the rights and obligations of the parties under their
agreement, the Supreme Court of Illinois stated at pp. 261-
262: "By the terms of its contract with plaintiff in error
[lessee], it [lessor] agreed that no other portion of its prem-
ises should be leased to any one engaged in the prohibited
line of business, and if it failed to prevent any subsequent

tenant from engaging in the business of making a specialty of the sale of pearls, it did so at the risk of plaintiff in error terminating his lease and surrendering possession of the premises." And with respect to the relief available to the injured covenantee, the court continued at p. 262: "It is idle to say that an action for damages for a breach of contract would afford him ample remedy. He contracted with defendant in error [lessor] for the sole right to engage in this specialty in its building, and if defendant in error saw fit to ignore that provision of the contract and suffer a breach of the same, plaintiff in error had the right to terminate his lease, surrender possession of the premises and refuse to further perform on his part the provisions of the contract."

Another decision in point is *Hiatt Investment Co.* v. *Buehler*, 225 Mo.App. 151 [16 S.W.2d 219]. There the defendant leased a drug store from the plaintiff. Attached to the lease was a rider which provided: "It is expressly understood there is to be no other drug store in the holdings of the Hiatt Investment Company." Shortly after the execution of the lease the lessor sold one of its vacant lots, which was across the street from lessee's drug store. The purchaser of the property erected a building thereon and leased one of the store rooms to a competing drug firm. Because of this threat to his business and likely financial loss, the defendant sold his stock of merchandise and vacated the premises. Plaintiff sued for the balance of the rent reserved in the lease and the defendant filed a counterclaim based upon the violation of his exclusive business privilege under the terms of the agreement. Judgment was rendered against the plaintiff and for the defendant for damages for breach of the restrictive covenant. The Missouri Court of Appeals affirmed that judgment holding that upon plaintiff's violation of its covenant, defendant was justified in vacating the premises and could not be required to pay any further rent. In that connection the court stated at p. 163: "The covenant in the case at bar goes to the whole consideration; it was not merely incidental to the main purposes of the lease and defendant elected to surrender the lease. The evidence shows that the lease would not have been executed if it had not been for the insertion of the restrictive covenant in it; that it was vital to the protection of defendant's business."

While search of the authorities has disclosed only these

two cases wherein the interdependence of the particular covenants here involved has been litigated in an action like the present one, the sound basis of these decisions effectively refutes plaintiff's claim that the general rules applicable to the interpretation of contracts have no bearing upon the construction of leases. The underlying principle of both cases—that covenants in leases are independent or dependent according to the nature of the obligations, their relation to each other, the intention of the parties as shown by the provisions of the governing lease, and the factual situation of each particular case—is in complete accord with the pertinent rules in this state as above noted.

The second question is whether the restrictive covenant was breached by leasing for the prohibited purpose or by the lessor's acquiescence in the conduct of the other lessee amounting to a violation of the restriction.

As to the first part of this question, relative to leasing for the forbidden purpose, the trial court found that plaintiff did lease *a portion of* the Medico-Dental Building to Dr. Boonshaft for the purpose of maintaining a drug store and selling drugs on the premises so demised; that, by executing such lease, plaintiff breached its agreement with defendant; and that, by virtue of one of the provisions of the lease with Dr. Boonshaft, plaintiff intended to and did give such tenant the right and privilege of maintaining a drug store, selling drugs and compounding prescriptions on the premises, and by so doing failed to protect the defendant against competition.

This finding, as to the purpose of plaintiff's demise to Dr. Boonshaft, was based undoubtedly upon inferences drawn from the provisions of that tenant's lease; inferences that plaintiff knew at the time such lease was executed that the Boonshaft Medical Group contemplated the conduct of a type of medical business which would require a large stock of drugs, and that a drug store would be operated in connection therewith; that Dr. Boonshaft regarded the privilege of maintaining a drug store as a material part of the consideration in support of his lease; and inferences drawn from the conduct of plaintiff and Dr. Boonshaft following the latter's entry into possession of the demised premises.

One of the provisions in the lease with Dr. Boonshaft read as follows: "The premises demised hereby are to be used solely as offices for the practice of medicine and dentistry, and

lessee agrees that he will not maintain therein . . . a drug store or drug dispensary, nor will lessee compound or dispense . . . drugs or ampoules except in connection with the regular course of treatment of lessee's own patients.'' This provision has been so drafted as to present an ambiguity in that a question arises whether the exception ''treatment of lessee's own patients'' refers only to the compounding or dispensing of drugs, or relates also to the maintenance of a drug store. In resolving this uncertainty the trial court construed the qualification to apply to *both* phases of activity and thus reasonably inferred that such language was intended to authorize the operation of a drug store, but only in connection with the ''treatment of lessee's own patients.'' Substantiating the propriety of this inference is the provision following the portion of the Boonshaft lease last quoted: ''Lessee agrees not to display any sign or advertisement on the inside or outside of the demised premises, or the building . . . embodying the words 'Pharmacy,' 'Drug Store,' 'Dispensary,' or words of like import.'' If it had not been contemplated that there would be maintained a drug store of some kind, even though it be one restricted to the service of lessee's own patients, it seems unlikely that a stipulation prohibiting an appropriate sign would have been included in the lease with Dr. Boonshaft. Of significance in considering the object of this limitation is the statutory definition of the term ''pharmacy.'' Section 4035 of the Business and Professions Code, so far as here pertinent, reads: '' . . . pharmacy means and includes every store or shop where drugs . . . are dispensed or sold at retail . . . or where prescriptions are compounded, which has upon it or in it as a sign, the words . . . 'pharmacy,' 'drug store,' . . . or any of these words.'' Plaintiff's incorporation of the code language in the Boonshaft lease suggests that it regarded a drug store which did not come within the exact definition of the statute not to be a drug store within the meaning of its covenant to protect Horton & Converse against competition, and so anticipated a defense in the event of a charge of violation of its obligation to defendant.

It is of no avail to plaintiff to argue that the premises were not leased to Dr. Boonshaft for the purpose of maintaining a drug store because he agreed not to display any such sign and never did so. The question of conformity with the statutory regulation does not enter into the determination

of whether the establishment of Dr. Boonshaft's *unadvertised* drug shop violated the contractual right of defendant to have the exclusive privilege of maintaining a pharmacy in the building. Insofar as defendant's contractual rights are concerned, the circumstance of Dr. Boonshaft's competing activities in relation to defendant's business, not the presence or absence of a suitable label for his shop, is the decisive factor. Plaintiff understood that under the Boonshaft medical plan of including certain drugs within the monthly service available to its patients under the scheduled fee and of furnishing them with other medicines "at a low cost," a sizable stock of drugs would be required and that Dr. Boonshaft would operate a drug store in connection with the medical practice of his Group. Confirmatory of plaintiff's appreciation of the scope of the Boonshaft business enterprise is the testimony of Mr. Wilder, plaintiff's property manager. In explanation of his statement that he did not know that a drug store was being operated on the ninth floor of the Medico-Dental Building in any other way than that prescribed by the lease, he said: "I mean that in the Boonshaft lease it specifically states that they cannot conduct a drug store or a pharmacy except to compound prescriptions for their own doctors. That is the substance of the lease, and that is what I mean by that, 'provided for as in the lease'."

To be noted here is the plaintiff's representation in its lease with Dr. Boonshaft that the defendant's exclusive right to maintain a drug store *in the building* related only to the *ground floor*. The provision in point reads: "Lessee understands that lessor has heretofore executed a lease to Horton & Converse granting to said Horton & Converse the exclusive privilege of conducting a drug store business on the ground floor of said Medico-Dental Building." The attorney who drafted this instrument for plaintiff testified that the exclusive privilege clause in defendant's lease was not shown to Dr. Boonshaft before he executed his lease with plaintiff. Such perversion of the facts as to defendant's contractual rights may have been the basis for the position taken by Dr. Boonshaft at the aforementioned conference of all the parties concerned on August 8, 1938, when he said: "I am doing only what my lease gives me the privilege to do." He did not say that he was not maintaining a drug store on the *ninth floor*. This is but another instance of plaintiff's attempt to circum-

vent its obligation to protect defendant's business against competition.

■ The trial court's finding that Dr. Boonshaft was conducting a drug store in the building has ample support in the record. Two inspectors of the State Board of Pharmacy testified that they had occasion individually to visit the ninth floor of the Medico-Dental Building between May 3, 1938, and August 31, 1938, and that they saw a separate room stocked with drugs, medicines, pharmacist's scales, mortars, graduates, the usual compounding equipment, and two licentiate certificates displayed. Another inspector, who had served twenty-five years on the board and was a registered pharmacist, testified that he visited the same quarters during the period mentioned and that in addition to the various pharmaceutical equipment and drugs, he noted pharmacy licenses and permits. In line with this evidence is the testimony of a registered pharmacist of thirty-five years' experience, who stated that he had been employed by Dr. Boonshaft from June, 1938, to September, 1938, and was in charge of the pharmacy room and dispensing department; that he worked their steadily during the month of August receiving and compounding prescriptions, and setting and collecting the charges therefor; that his duties there were no different from his duties in the prescription room in other drug stores where he had worked.

■ Another circumstance bearing on this phase of Dr. Boonshaft's activities is the statutory authorization for such practices as found in the Business and Professions Code. Section 4030 provides that " . . . it is unlawful for any person to . . . compound, sell or dispense any drug, poison, medicine or chemical, or to dispense or compound any prescription of a medical practitioner, unless he is a registered pharmacist . . . "; and section 4031 provides that "This . . . does not apply to . . . anyone, who holds a physician's and surgeon's certificate and who is duly registered . . . with supplying his own patients with such remedies as he may desire if he acts as their physician . . . and if he does not keep a pharmacy, open shop or drug store, advertised or otherwise, for the retailing of medicines or poisons." Thus, it was lawful for Dr. Boonshaft as a physician to supply his own patients with medicines, provided that he did not keep a pharmacy, open shop or drug store.

It would appear that in the execution of the Boonshaft lease the parties thereto had the foregoing statutory provisions in mind. The scrupulous care with which the provisions of that instrument were drafted so as not to conflict with the language of the mentioned code limitations demonstrates the plaintiff's assumption that such demise would not violate its covenant with Horton & Converse for the reason that Dr. Boonshaft would be acting within the bounds of his professional license. ▮ But the fact that Dr. Boonshaft may be entitled legally to maintain a drug store by employing a pharmacist does not satisfy the plaintiff's contractual obligation to protect defendant against competition in the building. A drug store conducted by a physician with a pharmacist in charge to supply medicines, sell drugs and compound prescriptions, not only for patients personally treated by the physicians, but also for patients treated by six, eight, or thirty doctors associated with him, would constitute as much competition as if the drug store were operated by a pharmacist, or any one not a physician. The drug shop maintained by Dr. Boonshaft was a drug store in every common acceptation of the term, regardless of the fact that it was operated in connection with the plan of his Medical Group on "premises demised . . . to be used solely as offices for the practice of medicine and dentistry." Defendant does not dispute the right of Dr. Boonshaft, as any other doctor in the Medico-Dental Building, to *supply* his own patients with medicines, but it does object to his distinguishable practice of *selling drugs* and *compounding prescriptions* in a pharmacy maintained as a functional part of the professional activities of the Boonshaft Medical Group.

▮ In measuring the breach of a covenant not to let for a specified purpose in cases where the objectionable competition is in connection with a business of a character other than that of the party entitled to protection by the lessor, technical subterfuges will be disregarded and the substance of the situation giving rise to the controversy will determine the issue. (*Parker* v. *Levin*, 285 Mass. 125 [188 N.E. 502, 90 A.L.R. 1446]; *Waldorf-Astoria Segar Co.* v. *Salomon*, 109 App.Div. 65 [95 N.Y.S. 1053], affirmed in 184 N.Y. 584 [77 N.E. 1197]; *Aiello Bros.* v. *Saybrook Holding Corp.*, 106 N.J.Eq. 3 [149 A. 587]; *Pappadatos* v. *Market Street Bldg. Corp.*, 130 Cal.App. 62 [19 P.2d 517].) As illustrative of

the principle of these decisions it will suffice to refer to the well-considered case of *Waldorf-Astoria Segar Co.* v. *Salomon, supra,* where it was held that the lessor violated his covenant against demising an adjoining store for the wholesale and retail cigar business by subsequently leasing the specified adjacent premises for a branch grocery store, in which the tenants as part of their business carried on the competing line of activity. Under analogous reasoning in the present case, the fact that Dr. Boonshaft maintained a drug store *in connection with* his medical business does not alter its competitive character insofar as the violation of defendant's contractual rights under its lease with plaintiff is involved.

Plaintiff suggests that defendant's action in vacating the premises was prompted by a desire to be relieved of the burden of an unprofitable bargain, and that defendant's charge that its lease was breached was a pretext to terminate a disadvantageous agreement. The argument is not persuasive under the prevailing facts. From the evidence that the Medico-Dental Building had been involved in bankruptcy proceedings and there were several vacancies in the building, it would seem more reasonable to infer, as the trial court may well have done, that the plaintiff's conduct in leasing to Dr. Boonshaft was inspired by the desire to be relieved of a vacant floor and to seize the opportunity which presented itself to demise an entire floor at one time to one person, even though such leasing for the purpose required would involve a question as to the violation of the exclusive privilege agreement with defendant. All of the surrounding circumstances, including the motive and anxiety of plaintiff to increase the occupancy of its building, the ambiguity in the phraseology of the challenged instrument, the representation that the non-competitive business privilege was restricted to the ground floor, and the claim that a physician had a statutory right to dispense medicines to patients not treated personally by him but by his associates, demonstrate that plaintiff was willing to take a chance that defendant, its tenant for then over twelve years, would not object if it entered into the questionable lease.

The determination by the trial court as to the plaintiff's purpose in making the lease with Dr. Boonshaft rested upon a consideration of facts and a construction of an ambiguous

agreement. Various evidentiary features of the case were analyzed as above detailed. ▮▮▮ In such situation where an instrument is susceptible of different interpretations, the one adopted by the trial tribunal, if it appears to be consistent with the intent of the parties, and not the result of an abuse of discretion, will not be disturbed by an appellate court. (*Kautz* v. *Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576, 582 [300 P. 34] ; *Manhattan Beach* v. *Cortelyou*, 10 Cal.2d 653, 660 [76 P.2d 483] ; *Whepley Oil Co.* v. *Associated Oil Co.*, 6 Cal.App.2d 94, 101 [44 P.2d 670] ; *Coviello* v. *Moco Fruit Co.*, 42 Cal.App.2d 637, 640 [109 P.2d 765] ; *Neff* v. *Mutual Life Ins. Co.*, 48 Cal.App.2d 110, 112 [119 P.2d 404].) The findings of the trial court as to this point are fully sustained by the evidence.

▮▮▮ As to the second part of the second question— whether the restrictive covenant was breached by the plaintiff's acquiescence in the conduct of Dr. Boonshaft amounting to a violation of the restriction—the trial court found that the plaintiff in not taking immediate action to abate the drug store on the ninth floor and in advising defendant that it could not do anything with Dr. Boonshaft with respect to the objectionable activity, breached its lease with defendant.

Bearing on this feature of the case is the following evidence. The drug store on the ninth floor was opened in May, 1938. In the latter part of July, 1938, defendant learned that Dr. Boonshaft was maintaining a pharmacy on the premises, and on August 3, 1938, it wrote a letter to plaintiff protesting against the competing activity and demanding that plaintiff immediately put a stop to such objectionable practice. All of the parties concerned met in conference in defendant's office five days later, with the result that plaintiff promised to see what arrangements could be made and to advise defendant. Communications were thereupon had between plaintiff and Dr. Boonshaft, but defendant did not hear further from plaintiff until August 19, 1938, when plaintiff's attorney advised Mr. Horton, defendant's president, by telephone that he had been unable to do anything with Dr. Boonshaft, that "there could not be any arrangements made," and Mr. Horton then said that he thought the premises would be vacated, to which the attorney replied: "Use your own judgment about that."

From this summarization of the pertinent facts it appears

that defendant did not precipitately vacate the premises upon learning in the latter part of July, 1938, that the competing drug store was being operated, but followed a reasonable and deliberate course of action designed to afford plaintiff an opportunity to adjust the controversy in a manner consistent with the rights and obligations of the parties. That the plaintiff originally subscribed to defendant's view of the situation is indicated by the testimony of Mr. Wilder, plaintiff's property manager and representative at the conference of August 8, 1938. In this connection he testified: "Well, the meeting opened by my bringing to Dr. Boonshaft's attention the fact that he was definitely violating his lease." Continuing on the same subject, it further appears from the record that following a general discussion as to the competing features of the objectionable pharmacy and Dr. Boonshaft's assertion of his right to maintain it upon the floor·leased for the use of his medical organization, Mr. Wilder addressed the following words to the doctor: "You most certainly are violating the terms of the lease, as Horton & Converse have the exclusive privilege of selling drugs and medicines in the building." According to Mr. Wilder's account of the matter, the conference concluded with the acceptance of his suggestion that he undertake to negotiate some plan with Dr. Boonshaft whereby the latter would have his prescriptions filled by defendant. Relying upon plaintiff's admission that Dr. Boonshaft was violating his lease and that plaintiff would see what adjustment could be made, defendant cooperated further by waiting some two weeks more. Then in positive and unequivocal language the plaintiff advised defendant to the effect that negotiations were ended, that nothing could be done with Dr. Boonshaft, and that it could use its own judgment about moving from the building. From such definite, emphatic and final answer to its letter of protest of August 3, 1938, defendant was compelled to conclude that a continuation of cooperation with plaintiff in the hope that the dispute could be amicably settled would be useless and would involve a waiver of the breach, and that plaintiff was acquiescing in the violation by Dr. Boonshaft.

Plaintiff's change of attitude as to the propriety of Dr. Boonshaft's stand, in view of its previous representation to him as to the limited extent of defendant's exclusive business privilege, demonstrates that plaintiff was not willing to

challenge his position under authority of the following restrictive clause in his lease: ''Lessee agrees that he will not do, or permit to be done, anything in connection with the premises demised hereby which would in any way conflict with, or constitute a breach by the lessor therein of said Horton & Converse lease.'' These elements of finality in plaintiff's actions do not permit its assertion now that if given more time, it *might have reached* some satisfactory arrangement with Dr. Boonshaft commensurate with defendant's desire to be protected against his competing activities in the building. Plaintiff's answer to defendant's objection, after more than two weeks' consideration, was uncompromising in form. The time factor thus became immaterial insofar as defendant's hope of relief from any future negotiations on the part of plaintiff was concerned, and defendant was forced to elect whether it would continue under its lease after the next rent payment day and waive the breach, or vacate before the end of the month. ██ Waiver may be shown by conduct; and it may be the result of an act which, according to its natural import, is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished. (67 C.J. § 7, pp. 304-307.) Illustrative of the species of waiver which defendant sought to avoid here is the case of *Arcade Investment Co.* v. *Hawley,* 139 Minn. 27 [165 N.W. 477], where payment of rent by the lessee evidenced tacit consent to the lessor's breach of a restrictive covenant and precluded rescission of the lease. Confronted with this choice of action, defendant elected to rescind and did so by its letter to plaintiff under date of August 24, 1938, stating that it would vacate the premises before the end of the month. Although on August 20, 1938, the day following plaintiff's delivery of its ultimatum on the subject of defendant's protest, defendant closed its store, put signs on the door directing patrons to call at its other downtown establishments for service, and piled empty packing boxes on the floor of the pharmacy in an effort to impress plaintiff with its intention to move, defendant did not vacate the premises until eleven days later. However, plaintiff did not communicate with defendant before it moved on August 31, 1938.

The foregoing observations from the record demonstrate that the findings of the trial court relative to acquiescence have ample support in the evidence, and the conclusion is

required that plaintiff concurred in Dr. Boonshaft's maintenance of his drug store in the building.

The third point, that even if there was a breach of the restrictive covenant, it was not so substantial as to go to the whole of the consideration, was discussed in part in connection with the treatment of the first proposition concerning the interdependence of the parties' covenants under the terms of the lease. As was there stated, various special circumstances such as the exclusive nature of defendant's pharmacy, the limited source of its patronage, and the many years of its tenancy in the building establish the materiality of plaintiff's breach of its obligation to protect defendant against a rival business. Another factor substantiating this view is the record's disclosure that the Horton & Converse lease here involved would not have been executed had it not been for the insertion of the restrictive covenant in accordance with the request of Mr. Horton, defendant's president, that plaintiff's assignor incorporate in the instrument the same rights as to freedom from competition that defendant enjoyed under its previous lease of the same quarters in the Medico-Dental Building. Thus, it is apparent that the exclusive right to engage in a specified business in a particular building was the essence of the consideration for defendant's payment of rent during its many years of occupancy of the premises. It is reasonable to infer from the fact that an entire floor was leased ''as offices for the practice of medicine and dentistry'' that a substantial amount of business would be created by the various doctors occupying the several rooms on that floor, and that a drug store operated on that floor in connection with such practice would deprive defendant of a considerable source of revenue within the normal range of expectation. Plaintiff complains of defendant's failure to prove as a ground of rescission the prejudicial effect of Dr. Boonshaft's drug business and the exact pecuniary detriment sustained because of such competing activity. While consistent with practical considerations, it is said that a breach of a contractual right in a trivial or inappreciable respect will not justify rescission of the agreement by the party entitled to the benefit in question, a default in performance will not be tolerated if it is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the undertaking. (See discussion by Justice Cardozo in *Jacob &*

*Youngs* v. *Kent,* 230 N.Y. 239 [129 N.E. 889, 23 A.L.R. 1429].) But where, as here, the covenant of the lessor is of such character that its breach will defeat the entire object of the lessee in entering into the lease, such as rendering his further occupancy of the premises a source of continuing financial loss incapable of satisfactory measurement in damages, it must be held that the covenant goes to the root of the consideration for the lease upon the lessee's part. (*University Club* v. *Deakin, supra; Hiatt Investment Co.* v. *Buehler, supra.*) ▉ Commensurate with this principle, it is plain that the defendant's loss of potential business on account of the competing drug store was not a matter easily susceptible of monetary estimate, and proof of this element was not required of defendant under its presentation of the rights and duties of the parties in the circumstances of this case. A contrary view would authorize plaintiff to execute instruments similar to the Boonshaft lease for every floor of its building and thus render the restrictive covenant in defendant's lease valueless insofar as the protection of its essential source of income was concerned.

In the case of *Hiatt Investment Co.* v. *Buehler,* 225 Mo. App. 151 [16 S.W.2d 219], where, as previously noted, the lessor's breach of a restrictive covenant similar to the one here involved did not permit its recovery in an action for rent, the court observed at pp. 163-164: "Defendant herein had a choice of several remedies: (1) He could rescind the lease, in which case he would not have been required to pay any further rent; (2) He could have continued under his lease and at the end of the term sued for loss of the profits suffered by reason of the competition of the Crown Drug Company; (3) He could have treated the violation of the covenant by the plaintiff as putting an end to the contract for purposes of the performance and sued for damages. [citing numerous authorities.]" ▉ Defendant elected to pursue the first course, and in this case the state of the record showing plaintiff's departure in substance from its contractual obligation establishes the propriety of defendant's position in accord with its choice of available relief.

▉ As a fourth point of challenge to the adverse judgment, plaintiff contends that there was a waiver of the alleged violation of the restrictive covenant. In support of this proposition plaintiff refers to the following evidence in its behalf: That Dr. Boonshaft obtained a pharmacy license on

May 10, 1938, and that Mr. Walsh, vice-president of Horton & Converse, not only assisted Dr. Boonshaft in securing the license, but also signed it as a member of the California State Board of Pharmacy; that when Dr. Boonshaft objected to paying the sales tax on his retail purchases of drugs from defendant's store in the building, Mr. Walsh told him that the tax would be charged unless he bought wholesale; that appropriate credit arrangements were made as of June 25, 1938, a few days prior to Dr. Boonshaft's procurement of a retail sales tax permit, and from that date until the time of trial, Dr. Boonshaft purchased all his drugs wholesale from the defendant; that when Mr. Walsh visited the "drug room" on the Boonshaft premises in the latter part of April or the first of May, 1938, it was stocked with medicines and certain pharmaceutical equipment; that although Mr. Walsh was aware of the facts, no notice was given to plaintiff for three months; and that Mr. Horton knew that a drug store "was reputed to be operated on the ninth floor" three or four months prior to August, 1938.

However, all these matters concerned sharply disputed points as to which defendant offered substantial evidence to sustain its denial of a waiver, and upon these controverted issues of fact the trial court found in favor of defendant. The full and comprehensive findings on the contested charge of waiver by conduct, as hereinabove specifically set forth, show that Mr. Walsh did not assist or encourage Dr. Boonshaft in maintaining a drug store, or in obtaining a pharmacy license or sales tax permit. Plaintiff asserts that Mr. Walsh, a member of the State Board of Pharmacy, "signed Boonshaft's license" and refers to the name of Mr. Walsh on the license as his "signature" *attached* thereto. Apparently plaintiff sought by this species of evidence to create an inference that by personal contact with the license in signing it, Mr. Walsh had knowledge that Dr. Boonshaft was operating a drug store in the Medico-Dental Building at the time the license was issued, and that such form of acquiescence in the conduct of the competitive activity amounted to a waiver on defendant's part to raise later objections. However, according to the undisputed fact in the record, the name of Mr. Walsh was on the pharmacy license in facsimile and he had no personal contact with it. Other pertinent matters in evidence with relation to the claim of defendant's knowledge of and acqui-

escence in Dr. Boonshaft's practices dissipate the force of plaintiff's specious argument here. For eighteen years Horton & Converse had been engaged in operating a chain of exclusive prescription pharmacies in Los Angeles, and sold drugs retail and wholesale. Mr. Walsh was not stationed in the defendant's store in the Medico-Dental Building, and he only made occasional visits there. The defendant's wholesale department was not located there. From the time Dr. Boonshaft commenced to buy drugs wholesale from defendant, June 25, 1938, until the latter learned of the competitive drug store during the last week of July, only a month elapsed. Defendant had many wholesale customers, and it is not a necessary inference from the fact of Dr. Boonshaft's purchase from defendant's wholesale division, that Mr. Walsh or any other executive officer of defendant knew where the drugs were being delivered to the doctor or that he was maintaining a pharmacy. Both Mr. Horton, the president of Horton & Converse, and Mr. Walsh, the vice-president, testified in positive terms that they learned about the objectionable drug store during the last week in July. That was substantial testimony, and it was accredited by the trial court. Defendant promptly undertook to ascertain the facts and acted diligently in the matter by sending its letter of protest within a few days thereafter, August 3, 1938. Under the circumstances the trial court's findings that the defendant was not chargeable with a waiver of its contractual rights is unassailable.

The powers and duties of an appellate court in considering the point herein with regard to the purpose and interpretation of the lease has heretofore been discussed. As to the other points in the second, third and fourth questions—relating to acquiescence, whether the restrictive covenant runs to the whole of the consideration, and waiver—it must be recognized that the trial tribunal had the advantage of personal observation of the witnesses and that the appellate function is to consider not the relative weight of conflicting evidence but only the legal sufficiency of the record to sustain the findings. (*Bellon* v. *Silver Gate Theaters, Inc.*, 4 Cal.2d 1 [47 P.2d 462]; *Raggio* v. *Mallory*, 10 Cal.2d 723 [76 P.2d 660]; *Showalter* v. *Western Pacific R. R. Co.*, 16 Cal.2d 460 [106 P.2d 895].) Where different inferences might fairly and reasonably be deduced from the evidence, the choice made by the trial court, in the absence of an abuse of discretion, is binding

on the appeal. (*Hamilton* v. *Pacific Electric Ry. Co.,* 12 Cal. 2d 598, 602-604 [86 P.2d 829] ; *Beck* v. *Sirota,* 42 Cal.App.2d 551, 557 [109 P.2d 419].) The findings of the trial court as to these questions have ample support in the evidence and its decision will be sustained.

For the foregoing reasons the judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J. pro tem., concurred. Edmonds, J., concurred in the judgment.